Filed 8/22/16; on rehearing

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

        Plaintiff and Respondent,

        v.

GARY LEE GRIMES,

        Defendant and Appellant.

S076339

Shasta County
Super. Ct. No. 95F7785

        A jury convicted defendant Gary Lee Grimes of one count of murder with burglary and robbery special circumstances and one count each of robbery, burglary, conspiracy to commit robbery, conspiracy to commit burglary, and the unlawful driving or taking of a vehicle.  (Pen. Code, §§ 182, subd. (a), 187, subd. (a), 190.2, subd. (a)(17), 211, 459; Veh. Code, § 10851, subd. (a).)[1]  In connection with the murder, robbery, burglary, and conspiracy counts, the jury found true allegations that defendant inflicted great bodily injury upon the victim, an elderly person (§ 1203.09, subd. (a)), and that the offenses were committed while defendant was on parole (§ 1203.085, subd. (b)).  In a bifurcated proceeding, the trial court found true allegations that defendant had served four prior prison terms (§ 667.5, subd. (b)) and had been convicted of a serious or violent felony within the meaning of the "Three Strikes" law (§ 1170.12).  The jury returned a verdict of

---

[1]    All statutory references are to the Penal Code unless otherwise indicated.

**SEE CONCURRING AND DISSENTING OPINION**

1

death.  The trial court sentenced defendant to death for the murder and imposed a term of six years for the driving or taking of a motor vehicle and four one-year terms for the four prior prison term allegations.  Sentences on the remaining counts were imposed and stayed.

Over defendant's objection, the trial court excluded certain statements made by the actual killer of the murder victim in which the killer claimed that he acted alone in committing the murder and that defendant was not involved.  After an initial opinion was filed in this case, we granted rehearing to clarify the application of the hearsay exception for statements against the declarant's interest.  (Evid. Code, § 1230.)  We now conclude that the trial court erred in excluding the statements.  Although the error does not require reversal of the murder conviction and the special circumstance findings, it does require reversal of the judgment of death.

## I. FACTS

### A.  Guilt phase

#### 1.  *The offenses*

In October 1995, defendant, then 33 years old, was staying with a friend, Sheila Abbott (Sheila), in her trailer.  Also staying in the trailer were Sheila's son, Shane Fernalld; her daughter, Misty Abbott (Misty); and Misty's boyfriend, Patrick James Wilson, then 19 years old.  On the morning of October 18, John Morris, a 20-year-old friend of the family, arrived at Sheila's trailer.  At approximately noon, Morris, Wilson, and defendant obtained some medical gloves and bandanas from the trailer.  They tried on the bandanas, placing them over their mouths, before putting them in their pockets.  They then drove Morris's red sports car to a house in Redding shared by 98-year-old Betty Bone and her daughter.  They ransacked the house and took property, including a .38-caliber handgun, a

2

portable music player, some jewelry, a rifle, a telephone in a Styrofoam box, and a brown truck.

Bone was killed. Her body showed evidence of blunt force trauma to the head, ligature strangulation, and stab wounds. There was a telephone cord and a bandana around her neck. There was bruising on her tongue and lip that was likely caused by a gag. Her injuries were consistent with her having been knocked unconscious, strangled, and then stabbed repeatedly. Bleeding due to the stabbing was the primary cause of death, with strangulation as a contributory cause.

After the murder, defendant, Wilson, and Morris returned to Sheila's trailer, with Morris and Wilson in Morris's car and defendant driving the brown truck that had been taken from Bone's residence. They unloaded items from the truck. Defendant showed a bag of jewelry to Sheila and asked whether it was real; she told him it was costume jewelry. Defendant drove the truck to Shasta Lake, with Morris and Misty following in Morris's car. Defendant drove the truck into the lake, and the three returned to Sheila's trailer in Morris's car.

Later that afternoon, defendant, Morris, and Misty were in defendant's brown Camaro when they approached a roadblock that had been set up by the Shasta County Sheriff's Department. Before reaching the roadblock, defendant and Morris threw their guns into the bushes. When they went through the roadblock, defendant identified himself to an officer as "Gary Woods" and gave the officer a false Social Security number. He was wearing a pair of white fingerless gloves, similar to the type of gloves that Bone's daughter kept in the brown truck.

They returned to Sheila's trailer and then left for Sacramento. Misty and her baby rode in Morris's car and defendant drove in his car with Misty's brother, Shane Fernalld. They spent the night in Sacramento with Morris's aunt. In her apartment, they left a bag of jewelry and the box containing a telephone that had

been taken from Bone's house. The next day, Fernalld left defendant at the apartment complex in Sacramento.

## 2. *Defendant's arrest and statements to police*

Morris was arrested on October 21, 1995, three days after the crime, and killed himself in his jail cell the next afternoon. Wilson was arrested the following day. On that same day, a deputy sheriff recovered a long kitchen knife and a pocket knife that had been buried near Sheila Abbott's property. DNA from both knives was consistent with a mixture of Bone's DNA and Wilson's DNA; none of the DNA on the knives could have come from defendant.

Defendant was arrested the following day as he drove into the parking area of the Sacramento apartment complex. As he got out of the car, a loaded .22-caliber handgun fell out of the driver's side door. Defendant called Sheila from jail, and she told him that Morris had killed himself.

In a tape-recorded interview played for the jury at trial, defendant admitted to detectives that he was involved in the burglary and robbery. He denied any involvement in the murder, however, claiming Morris had killed Bone while defendant was in the back of the house. According to defendant, it had been Morris's idea to break into a house because he needed money to pay for his automobile insurance. Defendant said that he, Morris, and Wilson each had a bandana that Sheila had given them, and they had latex gloves that were obtained from her first-aid kit. Morris drove defendant and Wilson to Bone's neighborhood, an area in which defendant had formerly lived. In the car, defendant handed Morris a gun, which was wrapped in a bandana, and Morris put it in his pants. They then watched a house in the neighborhood and saw a woman outside. Morris said they could kill her and take their time going through the house, but defendant replied that he was "not into killin' people."

4

Defendant told the detectives that when they arrived at the Bone house, Morris and Wilson knocked on the door. Initially no one answered; Morris commented that no one was there and defendant concluded they would just be committing a burglary. Then Morris said that someone was in the house. Defendant walked back to the car and saw Bone answer the door. Wilson asked for a girl named Debbie and Bone replied, "no, my daughter's name is Barbara." Wilson pushed the door open, hitting Bone and knocking her to the ground. Defendant walked through the open door. At some point he saw Bone lying on the floor with Morris on top of her; Bone was pleading with him to let her go. Defendant said to Morris, "Don't hurt no women, don't hurt nobody." He said he went into the back of the house because he "couldn't deal with it." When he returned he saw Morris strangling Bone, who was tied up with a phone cord. Morris said, "I can't leave no witnesses," and "that fucking bitch won't die." Defendant then saw Morris rummaging through the kitchen looking for a knife, after which he saw or heard Morris stabbing Bone forcefully and repeatedly. Morris gave Wilson a paper sack containing the knives that were later recovered, and told him to get rid of them.

According to defendant, Morris ordered him to take Bone's truck. They loaded the items from the house into the truck and took them back to Sheila's trailer, where Wilson and Morris siphoned gas out of the truck. Defendant drove the truck to Shasta Lake, following Morris and Misty. Morris instructed defendant to break out the truck's windows and drive it into the lake.

Defendant told the detectives that the gun he had when he was arrested in Sacramento did not come from the house and he had obtained it that same day. He stated that Wilson had found a gun in Bone's house and Morris had found a rifle. Defendant denied knowing the location of the guns taken from the house and asserted that Morris was supposed to dispose of them.

5

Law enforcement officers recovered the guns that defendant and Morris had thrown into the bushes before going through the police roadblock. One of these guns had been taken from Bone's home.

### 3. *Testimony regarding out-of-court statements*

At trial, Misty Abbott testified that during the ride to Shasta Lake, Morris told her he had tried to strangle a woman, and when she did not die he took a knife from the kitchen and fatally stabbed her. She testified that during the ride back to her mother's trailer, after they had dumped Bone's truck in the lake, defendant and Morris fired their guns out of the windows of the car. When she was interviewed by Wilson's private investigator, she said that Morris and defendant laughed about the murder and called each other "down white boys." Misty's brother, Shane Fernalld, testified that while he and defendant were driving to Sacramento, defendant told Fernalld either that "she deserved it" or "she didn't deserve it"; Fernalld was not sure which. Before trial, however, Fernalld told several law enforcement officers that defendant's statement was "she deserved it" or "the old bitch deserved it." Morris's grandfather testified that, an hour or two before committing suicide, Morris called him from jail, sounding very upset, and said that Morris's friends had turned against him and were going to testify that he had killed Bone, but that he had not done it.[2]

Jonathan Howe, a prisoner who had been housed with defendant in the Shasta County Jail, testified that defendant told him about the murder. According to Howe, defendant said he had ordered Wilson and Morris to tie up and kill Bone,

---

[2] The trial court admonished the jury that it could not consider for its truth Morris's statement to his grandfather that he did not kill Bone; the court explained that the statement was relevant only in evaluating Misty's testimony regarding Morris's confession to her.

6

and that he could not be linked to the murder with DNA evidence because he had never touched the body. Howe also reported that defendant said either that he had enjoyed watching Bone killed or that he enjoyed the fact that she died. Howe testified under an agreement that permitted him to plead guilty to pending charges for a sentence of a maximum of 24 months, consecutive to a term he was already serving. Before coming forward, he had been offered a plea bargain with a 24-month consecutive sentence. Under the new plea agreement, he could receive a sentence of less than 24 months; his sentencing was postponed until after trial in the present case, at which time the judge presiding over defendant's trial would decide his sentence.

### 4. Defense evidence

The defense conceded that defendant was guilty of burglary, robbery, and murder, but contested the special circumstance allegations on the grounds that defendant was not the actual killer and lacked an intent to kill or a reckless indifference to life.

The defense introduced admissions made by Wilson to law enforcement officers that were consistent with defendant's statements to the police regarding Wilson's role: Wilson said he had participated in the burglary and had pushed Bone inside the house; when she fell back she was knocked out and he watched her for several minutes; he found a .38-caliber revolver in a toolbox in a closet in Bone's house; he cleaned the knives used to kill Bone by spitting on them and wiping them off with a cloth; he siphoned gas out of the truck before defendant drove it to the lake.

Defendant also presented evidence that Morris called Sheila Abbott's trailer the day after his arrest and asked her daughter, Ginger Abbott, to provide him with an alibi. Ginger refused.

The jury convicted defendant on all counts.

## B. Penalty phase

### 1. Aggravation

The prosecution introduced evidence that after driving the truck into the lake, defendant, Morris, and Misty bought and injected methamphetamine.

The prosecution also presented proof of defendant's 10 prior felony convictions, as well as evidence regarding four incidents in which he engaged in violent criminal conduct. Specifically, in 1985, defendant and accomplice Anna Cline tied up James Leonard and stole $300 from him. Defendant brandished a pipe that was wrapped in a towel to simulate a gun. Afterward, he and Cline used the money to buy drugs. A day after that robbery, a police officer saw defendant shooting a sawed-off shotgun in an orchard. In 1991, a police officer encountered defendant in a restaurant with a loaded .25-caliber semiautomatic handgun in his waistband. In 1993, during a fight with his girlfriend, defendant held her down in his car by her throat, threatening to choke her if she left him. When he stopped the car in a parking lot, she escaped. He ran after her and they struggled until police arrived.

### 2. Mitigation

The defense case in mitigation focused on two themes: defendant's cognitive impairment and his positive contributions to his friends and family members. Neuropsychologist John Wicks testified that he tested defendant's mental functioning in 12 areas, and that he scored in the mentally retarded range in seven areas, low dull-normal in two areas, and normal in three areas. Defendant's overall IQ score was 73, which is borderline retarded, and he generally tested in the range of third to fourth grade in reading, spelling, and arithmetic. Wicks concluded that defendant had organic brain damage and that his low intellect could

8

impair his judgment and decisionmaking ability, cause impulsivity, and make it difficult for him to learn academic subjects and acceptable social behaviors.

Psychiatrist Albert Globus, who interviewed defendant and reviewed the test results, agreed with Dr. Wicks's findings. Dr. Globus thought defendant suffered from organic brain damage at birth (possibly due to beatings his mother suffered while pregnant), based on the test results and on his low birth weight, trouble breastfeeding, loss of weight during his first week of life, incontinence up to the age of eight, and a speech impediment. At age 12, he suffered a serious head injury which may have exacerbated his brain disorder. Although defendant could determine right from wrong, Dr. Globus concluded that he would have difficulty applying that knowledge to his decisionmaking and would likely rely on others to make decisions for him. People like defendant, he said, often function better in a structured setting like prison because most decisions are made for them.

At age nine, defendant was referred to a psychiatrist, who prescribed Ritalin and Librium. At age 11, he was placed in special education classes for emotionally disturbed children. Defendant's special education teacher, a teacher's aide, and a resource specialist for the special education program described defendant, at that time, as nonaggressive, well behaved, a follower, and someone in need of love and attention. At age 15, he began running away from home and was placed in foster care and then juvenile hall. He was committed to Napa State Hospital at age 17 for nine months. His records from the hospital indicate he was mildly mentally retarded and had latent schizophrenia.

Defendant's sister, Darlene, testified that when defendant was a young boy he was incontinent and their mother made him wear a dress and stand out in the yard as punishment. Defendant, she said, lacked self-esteem and confidence, and was a follower who did what others told him to do.

9

Defendant's mother, Patricia Grimes, testified that she loved her son. She testified that defendant's father beat her while she was pregnant and left her before defendant was born. After the birth, she was in the hospital for more than three months with postpartum depression and defendant lived with her parents. She recalled that at a young age, he told her he heard voices and he would wake in the night screaming. Defendant's mother also testified that the day before he was arrested, he was crying and remorseful, and said he was very sorry that the victim had died.

Defendant's ex-wife, Cindy Grimes, who was briefly married to defendant in 1990, testified that she loved him and he had treated her and her teenage son well. Defendant also helped take care of her disabled father. Her son, Michael, testified that defendant treated both of them very well, and had influenced him to get his General Educational Development certificate and stay out of trouble with the law. Cindy's mother and the manager of their apartment complex confirmed that defendant was helpful and kind to Cindy's family and to others who lived in their apartment complex. A fellow prison inmate, Michael Huntsman, testified that defendant came to his aid when he was assaulted by a group of inmates.

In 1995, defendant attempted to assist the mother of his fiancée, Shannon Yarnell, in a domestic violence incident involving Shannon's stepfather. The incident ended in tragedy, however, when Shannon's stepfather rammed his truck into the car in which Shannon was riding, killing Shannon.

## II. DISCUSSION

### A. Exclusion of Morris's alleged statements against interest

As previously explained, witness Misty Abbott testified for the prosecution that while she was driving with John Morris to Shasta Lake shortly after Bone was murdered, Morris told her he killed Bone, first attempting to strangle her and then,

10

because she did not die, taking a knife from the kitchen and stabbing her. The trial court admitted this statement as a declaration against Morris's penal interest. (Evid. Code, § 1230.)

The defense also sought to admit an additional statement made in the course of the same conversation: According to defendant's offer of proof, Misty would testify that when asked whether defendant took part in the killing, Morris responded that he had not; Morris told Misty that after he "did the lady," defendant and Wilson "looked at [Morris] as if they were saying, what in the hell are you doing, dude." The defense also proffered evidence that while Morris was incarcerated in the county jail following his arrest for murdering Bone, he told inmate Albert Lawson that he stabbed Bone and "grabbed her by the throat," and that defendant and Wilson "were in the house but took no part in the actual killing." Lawson did not testify at trial.

The trial court ruled that Morris's statement to Misty was inadmissible hearsay that did not qualify as a declaration against interest. The court ruled that Morris's statement to Lawson that he stabbed Bone and grabbed her by the throat was admissible, but that his statement that defendant and Wilson took no part in the actual killing was not.

Defendant asserts the statements were admissible as declarations against interest and that the trial court's rulings violated his right to due process, a fair trial, to present a defense, and to reliable procedures in death penalty cases. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) As explained below, the trial court erred in excluding the testimony under Evidence Code section 1230, and the error, while harmless at the guilt phase of trial, requires reversal of the judgment of death.

11

## 1. *Declarations against interest*

Although hearsay statements are generally inadmissible under California law (Evid. Code, § 1200, subd. (b)), the rule has a number of exceptions. One such exception permits the admission of any statement that "when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) As applied to statements against the declarant's penal interest, in particular, the rationale underlying the exception is that "a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement against that interest," thereby mitigating the dangers usually associated with the admission of out-of-court statements. (*People v. Spriggs* (1964) 60 Cal.2d 868, 874.)[3]

---

[3] In its traditional form, the against-interest exception permitted the admission of out-of-court statements against the declarant's pecuniary or proprietary interest, but not statements against penal interest. (See *Donnelly v. United States* (1913) 228 U.S. 243; *People v. Spriggs*, *supra*, 60 Cal.2d at p. 870.) This limitation — often recited, rarely explained — came under vigorous criticism. (See *ibid.*) Dean Wigmore, citing Justice Holmes's dissent in *Donnelly*, forcefully advocated "discard[ing] this barbarous doctrine, which would refuse to let an innocent accused vindicate himself" by producing the confession of an unavailable declarant. (5 Wigmore, Evidence (Chadbourn ed. 1974) § 1477, p. 360; see *Donnelly*, at pp. 277-278 (dis. opn. of Holmes, J.) [observing that the confession of the unavailable declarant in that case "would have a very strong tendency to make anyone outside of a court of justice believe that Donnelly did not commit the crime," since "no other statement is so much against interest as a confession of murder"].) Siding with the critics, this court in *Spriggs* extended the against-interest exception to encompass statements against penal interest. (*Spriggs*, *supra*, 60 Cal.2d at p. 870.) When the Legislature later enacted

*(Footnote continued on next page.)*

To demonstrate that an out-of-court declaration is admissible as a declaration against interest, "[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).) "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." (*People v. Frierson* (1991) 53 Cal.3d 730, 745.)

We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153, citing *People v. Gordon* (1990) 50 Cal.3d 1223, 1250-1253 (*Gordon*).) Whether a trial court has correctly construed Evidence Code section 1230 is, however, a question of law that we review de novo. (See *Gordon* at p. 1251 [while the application of the against-interest exception "to the peculiar facts of the individual case" is reviewed for abuse of discretion, "we review the specific determinations underlying the court's ruling under the standards

---

*(Footnote continued from previous page.)*

Evidence Code section 1230, it codified this understanding of the against-interest exception. (See Assem. Com. on Judiciary, com. on Assem. Bill No. 3212 (1965 Reg. Sess.) reprinted at 29B pt. 4 West's Ann. Evid. Code foll. § 1230, p. 289 [Evidence Code section 1230 "codifies the hearsay exception for declarations against interest as that exception has been developed by the California courts"].)

appropriate thereto"]; *People v. Louis* (1986) 42 Cal.3d 969, 985 [conclusions of law are subject to de novo review].)

As the trial court in this case correctly held, the portions of Morris's statements admitting to stabbing Bone were admissible under Evidence Code section 1230 because a reasonable person in Morris's position would have believed that these admissions would subject him to criminal liability. Defendant's challenge concerns the portions of Morris's statements indicating that (1) defendant did not participate in the killing, and (2) defendant reacted with surprise when Morris killed Bone. In excluding these portions of the statements, the trial court reasoned that "if somebody is confessing to a murder and to personally being the one who stabbed someone, . . . it does not in any way significantly enhance the personal detriment to the confessor if he says nobody else had any part in it. . . . [T]he fact that the others did or did not assist him isn't going to diminish his exposure, his public ridicule, et cetera." The court found *People v. Gatlin* (1989) 209 Cal.App.3d 31 (*Gatlin*) to be controlling.

The trial court's ruling reflects a misunderstanding of the law governing the admission of statements against interest.[4] As an initial matter, to the extent the

---

[4] The concurring and dissenting opinion (conc. & dis. opn. of Cantil-Sakauye, C.J., *post*, at p. 4) asserts that our holding fails to pay the proper deference to the trial court's ruling under the abuse of discretion standard of review. But the abuse of discretion standard is designed to pay deference to trial courts' application of the governing law to the "peculiar facts of the individual case." (*Gordon*, *supra*, 50 Cal.3d at p. 1251.) It is not designed to insulate legal errors from appellate review. (*Ibid.*)

The justices now concurring and dissenting appeared to recognize as much at an earlier stage of the case. This court's original opinion affirming the judgment, which they signed, was not based on any deference to the trial court's ruling. Rather, the opinion concluded with respect to one of the statements that even though the trial court's stated basis for excluding the evidence was faulty, the trial court reached the right result for the wrong reasons; with respect to the

*(Footnote continued on next page.)*

14

trial court relied on *Gatlin*, *supra*, 209 Cal.App.3d 31, its reliance was misplaced. In *Gatlin*, a defendant charged with burglary sought to introduce recordings of statements by three codefendants. The codefendants claimed the defendant "had nothing to do with [it]," but they made these statements while disclaiming their own involvement. (*Id.* at p. 44.) The Court of Appeal thus held that their exculpation of the defendant was "not specifically disserving" (*ibid*.) because it was made in the context of the declarants' "self-serving" denials of culpability (*id.* at p. 43). Here, by contrast, the portions of Morris's statements at issue were made during conversations in which Morris admitted personally murdering the victim by choking and stabbing her — admissions that unquestionably were against Morris's interest.

The Attorney General argues that the trial court nevertheless properly excluded the relevant portions of Morris's statements because they were collateral assertions that tended to exculpate defendant, not to "further incriminate" Morris. The Attorney General contends that the trial court's parsing of Morris's statements was necessary because Evidence Code section 1230 does not permit the admission of "any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441 (*Leach*).) As the Attorney General's argument demonstrates, the proper application of the *Leach* rule appears to have generated some confusion. We therefore discuss the origins and purpose of the rule in some depth.

---

*(Footnote continued from previous page.)*

remaining statements, the opinion simply concluded that any error in excluding the statements was harmless.

The question in *Leach* concerned the admissibility of coconspirators' extrajudicial confessions implicating other defendants in a murder plot, which the prosecution introduced as, inter alia, declarations against penal interest. (*Leach*, *supra*, 15 Cal.3d at pp. 428, 438.) This court concluded that to the extent the confessions contained collateral assertions that inculpated the defendant, rather than the confessor, the statements were inadmissible. (*Id.* at pp. 441-442.) We explained that those portions of a confession inculpating others are not as inherently trustworthy as those portions that are actually disserving to the declarant's interests. (*Id.* at pp. 439-441.) The resulting rule, we noted, is consistent with the constitutional right of a defendant to confront his or her accusers: "[I]t is precisely the purpose of the Constitution — and, we might add, the hearsay rule — to 'protect defendants from statements of unreasonable men if there is to be no opportunity for cross-examination.' " (*Id.* at p. 441.) We further explained that "[t]his limitation on the against-interest exception was at least implicit" in decisions of this court and of the United States Supreme Court that generally forbid the prosecution in a joint trial of two defendants from introducing those portions of one defendant's confession that implicate the other defendant. (*Id.* at p. 441, fn. 17, citing *People v. Aranda* (1965) 63 Cal.2d 518, and *Bruton v. United States* (1968) 391 U.S. 123.)

The United States Supreme Court, interpreting an analogous exception to the federal hearsay rule, reached much the same conclusion when it later addressed the issue in *Williamson v. United States* (1994) 512 U.S. 594 (*Williamson*). The court held that the against-interest exception did not authorize the admission of those portions of a third party's out-of-court confession that tended to shift blame to the defendant. The court explained that the exception "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements

16

unless they believe them to be true." (*Id.* at p. 599.) That notion, the court explained, does not extend to the entirety of the broader statement in which the self-inculpatory statement appears. Where, as in the *Williamson* case, "part of the confession is actually self-exculpatory, the generalization on which [the hearsay exception] is founded becomes even less applicable. Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements." (*Id.* at p. 600.)

Concurring in the judgment, Justice Kennedy noted that this approach raises questions as applied to collateral statements that exculpate, rather than inculpate, the defendant. Justice Kennedy gave as an example a statement in which a declarant said, " 'I robbed the store alone,' " but a criminal defendant on trial for robbery was permitted to introduce "only the portion of the statement in which the declarant said 'I robbed the store.' " (*Williamson*, *supra*, 512 U.S. at p. 617 (conc. opn. of Kennedy, J.).) Such a result, Justice Kennedy opined, "seems extraordinary." (*Ibid.*) The *Williamson* majority did not directly respond to Justice Kennedy on this point, since no such issue was raised in the case. But the majority did make clear that the proper application of the rule depends on context. The majority explained that "[t]he question under [the against-interest exception] is always whether . . . '. . . a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." (*Id.* at pp. 603-604.)

In the wake of *Williamson*, the United States Court of Appeals for the Ninth Circuit has considered how the rule applies to a statement in which the declarant both inculpates himself and exculpates another, much as in Justice Kennedy's hypothetical. (*U.S. v. Paguio* (9th Cir. 1997) 114 F.3d 928 (*Paguio*).) In *Paguio*,

the court reversed the defendant's conviction on the ground that the trial court abused its discretion by admitting his father's confession that he had falsified certain tax forms, but excluding the portion of the statement that represented that the son " 'had nothing to do with it.' " (*Id.* at pp. 934-935.) Writing for the court, Judge Kleinfeld explained that, in context, the latter statement both disserved the father's interests, insofar as "leading others into wrongdoing has always been seen as especially bad," and was "not practically separable" from the remainder of the confession. (*Id.* at p. 934.) The court rejected the government's argument that the rule announced in *Williamson* "mean[s] that the trial judge must always parse the statement and let in only the inculpatory part." (*Ibid.*) Rather, "[i]t means that the statement must be examined in context, to see whether as a matter of common sense the portion at issue was against interest and would not have been made by a reasonable person unless he believed it to be true." (*Ibid.*) "As a matter of common sense," the court explained, this is less likely to be true when the statement takes the form " 'I did it, but X is guiltier than I am,' " than when the statement is " 'I did it alone, not with X.' That is because the part of the statement touching on X's participation is an attempt to avoid responsibility or curry favor in the former, but to accept undiluted responsibility in the latter." (*Ibid.*; see also *U.S. v. Lopez* (10th Cir. 1985) 777 F.2d 543, 554 [trial court erred in excluding hearsay statements of a passenger in a vehicle that he alone had placed cocaine into the vehicle and that the defendant was not aware of the drugs prior to transporting them].)

Our cases, too, have taken a contextual approach to the application of the *Leach* rule. We have applied *Leach* to bar admission of those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others. (*Duarte*, *supra*, 24 Cal.4th at p. 612 [excluding portions of confession that, "far from 'specifically disserving' [the declarant's] penal interests, positively

18

served those interests"]; cf. *In re Sakarias* (2005) 35 Cal.4th 140, 155 [under the *Leach* rule, portions of declarant's confession that tended to inculpate an accomplice "could well have been held inadmissible as attempts to deflect culpability away from the declarant"].) But we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely "self-serving," but "inextricably tied to and part of a specific statement against penal interest." (*People v. Samuels* (2005) 36 Cal.4th 96, 120-121 (*Samuels*) [upholding the trial court's admission of declarant's assertion that the defendant had paid him to kill the victim, and rejecting the argument that the reference to the defendant "should have been purged," where the statement in question was "in no way exculpatory, self-serving, or collateral"].) In *Samuels*, we applied the *Leach* rule to admit evidence that inculpated the defendant. By the same token, the *Leach* rule permits courts to consider whether the portion of a confession that tends to exculpate another, rather than to shift blame or curry favor, should be admitted in view of surrounding circumstances, even though the exculpatory portion of the statement is not independently disserving of the declarant's interests.

In advocating a contrary rule, the Attorney General relies heavily on *People v. Lawley*, *supra*, 27 Cal.4th 102, in which we applied the *Leach* rule in upholding a trial court's exclusion of those portions of an out-of-court confession that were neither self-exculpatory nor inculpatory of the defendant. That reliance is misplaced. The defendant in *Lawley* was charged with murder, conspiracy to commit murder, and solicitation to commit murder. At his trial, he sought to present evidence that an alleged coconspirator had confessed to killing the victim pursuant to a contract issued by the Aryan Brotherhood prison gang. The trial court admitted the portion of the statement confessing to accepting payment for killing the victim, but excluded the portion identifying the Aryan Brotherhood as

19

having issued the contract, as well as the declarant's statement that "an innocent man was in jail," charged with the crime. (*Id.* at p. 152.) In upholding the trial court's ruling, we noted that the excluded statements did not make the declarant "more culpable than did the other portions of his statement" (*id.* at p. 154) or "further incriminate" the defendant (*id.* at p. 155, fn. 21). But as our later decision in *Samuels* makes clear, *Lawley* did not announce a rigid or hypertechnical application of the *Leach* rule that would in all cases require exclusion of even those portions of a confession that are inextricably intertwined with the declarant's admission of criminal liability. (See *Samuels*, *supra*, 36 Cal.4th at pp. 120-121 [distinguishing *Lawley*].) *Lawley* itself affirmed that "[w]hether a statement is self-inculpatory or not can only be determined by viewing the statement in context." (*Lawley*, at p. 153.) Further, as we also explained, the proffered evidence in that case lacked "sufficient reliability to demand its admission." (*Id.* at p. 155; see *id.* at pp. 174-175 (conc. opn. of Brown, J.); cf. *Samuels*, at p. 121 ["[T]he differences between the trustworthiness of the statements involved in this case and those excluded in [*Lawley*] are palpable."].)

In short, the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not "further incriminate" the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that "a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true." As the court recognized in *Paguio*, such a statement is more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility, as in the example " 'I robbed the store alone,' " as opposed to attempting to assign

greater blame to others, as in the example, " 'I did it, but X is guiltier than I am.' " (*Paguio*, *supra*, 114 F.3d at p. 934.) Of course, not all such statements are admissible; sometimes a declarant who makes an inculpatory statement may have a substantial incentive to exculpate others. A member of a criminal street gang, for example, may choose to take the fall for fellow gang members by making a confession that exculpates them. A trial court in that situation may reasonably conclude that the declarant's incentive to protect his friends renders the exculpatory portions of the statement inadmissible. (See *Duarte*, *supra*, 24 Cal.4th at p. 611 [to be admissible under Evid. Code § 1230, a declaration must be shown to be "sufficiently reliable to warrant admission despite its hearsay character"].) But such a statement is not, as the Attorney General argues, automatically inadmissible merely because it does not render the declarant more culpable than the other portions of his confession — or because, as the trial court put it in this case, the statement does not "significantly enhance the personal detriment" to a person who has already confessed responsibility for the crime.

The concurring and dissenting opinion faults us for "watering down the standard for admission under the against-interest exception." (Conc. & dis. opn. of Cantil-Sakauye, C.J., *post*, at p. 9.) But in rejecting the Attorney General's argument, we have broken no new ground. A rule that permitted admission of no more of a declarant's statement than was necessary to expose him to criminal liability, requiring courts to mechanically sever and excise the rest, certainly might be easier to apply. But as the concurring and dissenting opinion itself appears to recognize, this is not the rule we have: Under the law as it has developed in California, as in the federal system, context matters in determining whether a statement or portion thereof is admissible under the against-interest exception. This contextual approach accords with the rationales underlying the modern

21

expansion of the rule governing the admission of statements against interest. (See *Paguio*, *supra*, 114 F.3d at p. 934; see also fn. 1, *ante*.)

Applying that approach in this case, we conclude that defendant's proffered statements to Lawson and Misty were declarations against interest. Considered in context, the disputed portions of those two statements form part of Morris's admission of responsibility for killing Bone and thus, for purposes of Evidence Code section 1230, are not practically separable from the remainder of the statements. In each instance, the disputed portion of the statement elaborated on Morris's responsibility for the murder; rather than attempting to minimize his responsibility or shift blame to others, Morris instead assumed sole responsibility. A reasonable person in Morris's position, moreover, would have understood that Morris's explanatory comment in his statement to Misty — when he confessed to undiluted responsibility for carrying out the brutal murder of Bone and elaborated on that confession by acknowledging that his confederates looked on in surprise as it occurred — was against his penal interest. Of course, his elaboration did not specify the reason for his confederates' surprise, whether the fact of the killing, the brutal manner in which it was carried out, or both. But under any conceivable interpretation of the statement, it tended to underscore Morris's responsibility for the crime, rather than diminish it.[5]

---

[5] The concurring and dissenting opinion speculates that this portion of Morris's statement to Misty may have reflected Morris's impression that defendant and Wilson (1) "were surprised" that he had difficulty killing Bone; (2) were "annoyed or frustrated" that the killing took as long as it did; or (3) were "amused by the circumstances of the killing." (Conc. & dis. opn. of Cantil-Sakauye, C.J., *post*, at p. 6.) But in context, this portion of the statement was simply an elaboration on Morris's acknowledgment that defendant and Wilson did not participate in the murder. The trial court viewed it in that light, explaining in its tentative ruling that it provided "details regarding" Morris's observation that defendant and Wilson "did not take part in the killing." The prosecutor did not

*(Footnote continued on next page.)*

Certainly under California law, while Morris's role as an actual killer in a felony murder made him eligible for the death penalty regardless of the role played by his confederates, his admission of sole responsibility for the brutal murder of Bone would have qualified as an aggravating circumstance tending to justify imposition of the death penalty. (See § 190.3, factor (a); *People v. Carpenter* (1997) 15 Cal.4th 312, 414-415 [that defendant acted alone could be considered by jury as a circumstance of the crime in determining penalty], disapproved on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190;

_____

*(Footnote continued from previous page.)*

challenge this characterization. When a "third person talks to a friend or acquaintance in a purely private setting and implicates himself in the charged crime, while saying expressly that defendant was not involved," the entire statement is admissible "when there is a close logical and narrative connection between the part of the statement implicating the speaker and the part referring to the defendant." (5 Mueller & Kirkpatrick, Federal Evidence (4th ed. 2013) § 8:131, p. 198.) That was the case here.

Even if we were to accept the concurring and dissenting opinion's speculations as to the statement's further meaning, the bottom line is that any reasonable interpretation of the statement reflects Morris's acceptance of sole responsibility for a brutal killing, and thus forms part of a specific statement against Morris's penal interest. The statement is therefore unlike the one at issue in *Andrews v. United States* (D.C. 2009) 981 A.2d 571, 576-577, cited by the concurring and dissenting opinion, where the trial court found, and the appellate court agreed, that the entire statement at issue was reasonably construed in a manner that did not expose the declarant to criminal liability.

Ultimately, the concurring and dissenting opinion's argument relates not to whether Morris's statements were against his penal interest — they clearly were — but to whether Morris's statements were sufficiently powerful evidence of defendant's noninvolvement in the killing that they would have made a difference in defendant's trial. For the reasons explained below, we do not believe they would have made a difference at the guilt phase. But we cannot say that the jury's verdict at the penalty phase was " 'surely unattributable' " to the trial court's error in excluding the statements from evidence. (*People v. Neal* (2003) 31 Cal.4th 63, 86, quoting *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

23

*People v. Howard* (1992) 1 Cal.4th 1132, 1195 [defendant's role as the actual killer and motivating force behind the crime was a factor aggravating his culpability].) And while Morris may not have been familiar with the intricacies of California's death penalty law, it is reasonable to infer that he understood the commonsense notion that killers who act on their own are likely to be punished more severely than those who were encouraged or assisted by a confederate, or who played some lesser role in the act.

Finally, neither the circumstances in which the statements were made nor Morris's relationship to defendant provide reason to believe that Morris made the statements to protect defendant. (See *People v. Frierson*, *supra*, 53 Cal.3d at p. 745.) There was no evidence that defendant and Morris were close friends, which might have given Morris a motive to protect defendant by minimizing his participation in the murder. Defendant and Morris do not appear to have known each other well; indeed, defendant told the police that he did not even know Morris's last name. And while some offenders may attempt to enhance their reputations by bragging about crimes they did not commit or exaggerating the extent of their responsibility for a criminal act (see, e.g., *People v. Nunez* (2013) 57 Cal.4th 1, 13 [expert testimony that gang members may "brag about crimes they did not commit to gain a reputation"]; *People v. Gonzales* (2011) 52 Cal.4th 254, 292 [same]), Morris had no apparent incentive to attempt to enhance his reputation in such a manner in his conversation with Misty. Moreover, Morris committed suicide not long after making his statement to Lawson, and it is unlikely that a person contemplating suicide following his arrest for murder would have any interest in enhancing his reputation in jail.

In short, we can think of no plausible reason (and none has been offered by the trial court, by the Attorney General, or in the concurring and dissenting opinion) why Morris's assertion to Lawson that defendant and Wilson took no part

in the killing of Bone, and his assertion to Misty that both of them were shocked when Morris killed her, would be any less trustworthy than the remainder of Morris's confession. This is hardly surprising: In the absence of any special relationship with defendant and Wilson, why should he lie not only about having committed a brutal murder, but also about their lack of involvement and their surprise at his conduct?

We therefore conclude that Morris's statements to Misty and Lawson that he acted alone and that defendant and Wilson appeared startled when he killed Bone were so disserving to his interests that a reasonable person in his position would not have made them unless they were true. The statements were thus admissible under Evidence Code section 1230.

### 2. Prejudice

Before turning to the question of whether the trial court's error was prejudicial, we briefly pause to consider the appropriate standard of review. In this case, the Attorney General did not argue, in the answer brief she filed when this matter was first before this court, that any error in the trial court's exclusion of Morris's hearsay statements was harmless. This court invited the parties to submit supplemental briefs addressing the significance, if any, of that omission, and whether exclusion of the statements prejudiced defendant at the guilt and penalty phases of trial.[6] In his supplemental brief, defendant acknowledged that when trial

---

[6] Our order asked the parties to brief these questions: "1. Does the Attorney General's failure to argue in the answer brief that an alleged error is harmless constitute forfeiture of any harmless error argument regarding either state law errors or federal constitutional errors? 2. Assuming the trial court erred in excluding the hearsay statements of John Morris to Misty Abbott and Albert Lawson that were proffered by defendant as statements against interest, does the error require reversal of the special circumstances or death sentence? 3. Assuming that the trial court did not err in excluding Morris's statement to

*(Footnote continued on next page.)*

25

court error violates state law, no forfeiture occurs. He argued, however, that the error violated the federal Constitution, the Attorney General's failure to brief the question of prejudice acts as a forfeiture, and that a reviewing court can find the error in question harmless only in three limited circumstances: "(1) the record is short and straightforward and the court can easily determine prejudice on its own, (2) the harmless error question is in no doubt, and (3) a remand would be futile." The Attorney General, in turn, argued that any forfeiture does not affect this court's independent duty to determine whether any error was harmless.

We ultimately conclude that it is unnecessary to resolve this debate over the significance, if any, of the Attorney General's failure to brief the question of prejudice, because the answer to that question does not alter the outcome of the case. Under either California's traditional harmless error test or under the more rigorous standard advocated by defendant, the trial court's erroneous exclusion of Morris's statements to Misty and Lawson was harmless at the guilt phase of trial. And again, regardless of which test we apply, the error requires reversal of the judgment of death.

With respect to the effect of the error at the guilt phase, defendant acknowledges that the trial court's erroneous exclusion of the proffered evidence had no effect on his conviction for first degree murder; under the felony-murder rule, he was guilty of this crime regardless of whether he had anything to do with

_____

*(Footnote continued from previous page.)*

Abbott that after Morris killed the victim, defendant looked at him as if he were surprised, but that the trial court did err in excluding Morris's statements to Abbott and Lawson that defendant was not involved in the actual killing, does the error require reversal of the special circumstance findings or death sentence?"

the killing. He contends, however, that the error may well have affected the jury's finding with respect to the felony-murder special circumstances.

To find the special circumstances true, the jury had to find either that defendant acted with the intent to kill or that he assisted in the criminal enterprise as a "major participant" and acted with "reckless indifference to human life." (§ 190.2, subds. (c) & (d).) The excluded evidence that defendant expressed surprise after Morris killed Bone might well have affected the jury's determination with respect to whether defendant had the intent to kill. But the prosecution relied primarily not on that theory but on the evidence that defendant was a major participant who acted with reckless indifference to human life. That evidence was overwhelming.

In defendant's statement to the police, he admitted that he participated in the planning of the burglary/robbery that resulted in Bone's death and that he handed Morris a gun. He also admitted that he entered Bone's house along with Morris and Patrick Wilson, that he participated in the ransacking of the house, and that he drove away from the house in Bone's truck. These uncontroverted admissions overwhelmingly demonstrate that defendant was a major participant in the offense.

The evidence that defendant acted with reckless indifference to life is equally overwhelming. He knew Morris was armed: He told the police that before they entered Bone's home, Morris was looking for his gun and defendant gave it to him. Defendant also admitted that before they entered, Morris had observed a woman taking out her trash and said, " 'Fuck it, we'll just fuckin' kill her an' look at the house, we got all day long.' " Thus, even if, as defendant claimed, he responded to Morris's comment by telling Morris that he was "not into killin' people," he nonetheless handed Morris a gun and thereafter entered Bone's house with Morris while fully aware of Morris's desire to kill, thereby clearly

27

demonstrating reckless indifference to the possibility that a killing would indeed occur.

Based on this undisputed evidence, no reasonable jury could have found that defendant was not a major participant in the crime or that he did not act with reckless indifference to life. Thus, the trial court's exclusion of the evidence that defendant did not participate in the killing and was surprised that it occurred was harmless with respect to jury's finding as to the truth of the special circumstance, regardless of whether we apply the standard test for errors violating California law (see *People v. Watson* (1956) 46 Cal.2d 818, 836), the test for errors violating the federal Constitution (see *Chapman v. California* (1967) 386 U.S. 18), or (because this court may easily determine prejudice on its own) the test urged by defendant for cases in which the Attorney General did not brief the question of prejudice.

The error, however, was not harmless at the penalty phase. Under California law, the effect of a trial court's erroneous ruling on the admissibility of evidence is ordinarily measured by the standard first described in *People v. Brown* (1988) 46 Cal.3d 432, 448: "[W]e will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred." This reasonable possibility test " 'is the same, in substance and effect' " as the test for errors that violate the federal Constitution, which requires reversal unless the reviewing court can say beyond a reasonable doubt that the error was harmless. (*People v. Pearson* (2013) 56 Cal.4th 393, 472.)

The prosecutor's case in aggravation relied primarily on the circumstances of the offense. In his closing argument, the prosecutor told the jury: "The important thing to remember in your deliberations is to focus on the defendant and his conduct on [the day of the murder]. Not the defendant as a child, not the defendant at some other time in his life, but the defendant and his behavior on [the

28

day of the murder] . . . . This is the thing to focus on." Although the prosecutor never argued that defendant personally killed Bone, at the guilt phase the prosecution had presented the testimony of Jonathan Howe, who told the jury that defendant had ordered Morris to kill Bone and that he had enjoyed the victim's death. Howe's credibility was not a significant issue at the guilt phase; the central issue was, as noted, whether defendant was recklessly indifferent to the possibility that the robbery would result in a murder. But the issue took on particular significance at the penalty phase, when the jury was asked to fix a penalty for defendant's crime based on the precise nature of defendant's involvement in the death of Betty Bone — whether, as defendant argued, he was merely a follower of Morris's, or, as the prosecution argued, defendant was directly responsible for the planning of the murder. Howe's testimony that defendant had played a leadership role in the murder provided strong support for the prosecution's view that defendant should be held directly responsible for Bone's death. In response to defense counsel's argument that Howe was "not believable," the prosecutor argued that Howe's testimony was, in fact, worthy of belief: "[T]he defense has never been able to give you a reason that Mr. Howe would lie. They've never been able to give you any reason that he would simply make this up about the defendant. . . . They've never given you a reason to doubt his testimony." The prosecutor also emphasized the violent nature of the killing, arguing that defendant "stood by" while Bone was brutally strangled and stabbed to death.

The excluded statements would have given the defense a substantial basis for countering the prosecutor's argument. Misty would have testified that Morris told her that defendant did not take part in the killing and, after it happened, looked at Morris as if "saying, what in the hell are you doing, dude?" Lawson would have testified that while he was incarcerated in the county jail, shortly before Morris committed suicide, Morris told Lawson that defendant and Wilson

29

were "in the house but took no part in the actual killing." Based on these statements, the jury might well have concluded that, contrary to Howe's testimony that defendant had ordered the killing, the murder was, as the defense claimed, entirely Morris's idea and that defendant was shocked when it happened. Although defendant later told police that he had observed Morris strangling Bone and then saw or heard him stabbing Bone, neither statement is inconsistent with this conclusion; the jury might have inferred that defendant was surprised by Morris's actions while they occurred and remained surprised thereafter. And even had the jury interpreted Morris's description of defendant's surprise as a reaction not to the fact of killing, but, for example, the brutality with which it was carried out, the testimony still would have countered Howe's testimony that defendant had enjoyed the victim's death, as well as the prosecutor's argument that defendant deserved the death penalty because he "stood by" watching as Morris brutally strangled and stabbed the victim.

We cannot say with certainty whether the proffered evidence would ultimately have caused the jury to render a different verdict. But given the centrality of the issue of defendant's role in the murder — a murder that, as all acknowledge, defendant did not personally commit — we also cannot say that the jury's verdict was " 'surely unattributable' " to the trial court's error in preventing the jury from hearing evidence that tended to show that defendant not only did not participate in, but was surprised by, the brutal killing of Betty Bone. (*People v. Neal*, *supra*, 31 Cal.4th at p. 86, quoting *Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 279.) In sum, had the jury heard the excluded evidence, we find a "reasonable (i.e., realistic) possibility" that it would have rendered a different verdict.

30

(*People v. Brown*, *supra*, 46 Cal.3d at p. 448.)[7]  We must therefore set aside the judgment of death.

### B.  Instructions on circumstantial evidence

The trial court delivered the standard instruction regarding circumstantial evidence (CALJIC No. 8.83), which told the jury that (1) each fact that is essential to complete a set of circumstances necessary to establish the truth of a special circumstance must be proved beyond a reasonable doubt, and (2) if there are two reasonable interpretations of the circumstantial evidence, the jury must accept the one that favors defendant.  Defendant argues that instructing the jury regarding these principles only in connection with circumstantial evidence could cause the jury to believe that the principles did not apply when direct evidence is used.  (See *People v. Vann* (1974) 12 Cal.3d 220, 226-227 [instruction on circumstantial evidence, in the absence of a general instruction requiring proof of guilt beyond a reasonable doubt, might have been interpreted by jurors as requiring a lesser degree of proof if the evidence is direct].)  He contends the instruction undermined the requirement of proof beyond a reasonable doubt as applied to direct evidence, and that this instructional error requires reversal of the special circumstance finding because it could have affected the jury's consideration of Howe's testimony, which was direct evidence that defendant intended to kill.

The Attorney General contends defendant forfeited this claim by failing to ask the trial court to modify the standard instruction.  We agree.  "A party may not complain on appeal that an instruction correct in law and responsive to the

---

[7]      We would, of course, reach the same conclusion if we applied a more rigorous standard as a result of the Attorney General's failure to brief the question of prejudice.

31

evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024, disapproved on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; see *People v. Livingston* (2012) 53 Cal.4th 1145, 1165 [defendant forfeited claim that instruction discussing proof by direct evidence should have included additional principles related to the burden of proof beyond a reasonable doubt that were contained in the instruction on circumstantial evidence]; *People v. Bolin* (1998) 18 Cal.4th 297, 328 [defendant forfeited claim that instruction directing jury to find special circumstance not true if it had a reasonable doubt as to its truth was incomplete because it did not define reasonable doubt or direct the jury to find the special circumstance "beyond a reasonable doubt"].) The instructions regarding circumstantial evidence were not incorrect or inapplicable and defendant did not request any modification of the instructions to address the concerns he now presents.

Were we to address the merits, we would reject the claim. An instruction "[d]ifferentiating between direct and circumstantial evidence does not undermine the reasonable doubt standard or presumption of innocence." (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1166.) We addressed and rejected claims nearly identical to defendant's in *Livingston* and in *People v. Solomon* (2010) 49 Cal.4th 792, 825-827. In *Solomon*, the defendant argued that because the instruction on circumstantial evidence did not refer to direct evidence, "jurors would have believed that a fact essential to guilt that was based on direct, rather than circumstantial, evidence need not be proved beyond a reasonable doubt." (*Id.* at p. 826.) We noted that the trial court had instructed the jury "that both direct and circumstantial evidence were acceptable means of proof," that the defendant was to be presumed innocent, and that " 'in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.' " (*Ibid.*,

32

quoting CALJIC No. 2.90.) "These instructions, coupled with the directive to 'consider the instructions as a whole and each in light of the others,' fully apprised the jury that the reasonable doubt standard applied to both forms of proof." (*Solomon*, at p. 826.)

As in *Solomon*, here the trial court instructed the jury on the presumption of innocence and the requirement of proof beyond a reasonable doubt, and it told the jury to consider the instructions as a whole. We see no reasonable likelihood that because the jury was given some additional, more detailed, direction about how to apply the reasonable doubt standard to circumstantial evidence, but was not given such direction regarding direct evidence, the jury would have concluded that the reasonable doubt standard did not fully apply to proof by direct evidence.

Furthermore, the jury received additional relevant instructions applicable to the direct evidence with which defendant is here concerned — Howe's testimony that defendant told him he ordered the killing, which was evidence of defendant's intent. The jury was instructed that "if the evidence as to any specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence of the specific intent or mental state, you must adopt that interpretation which points to the absence of the specific intent or mental state."

### C. Failure to instruct that the jury must unanimously agree on any overt acts required for conspiracy to commit robbery

Defendant was convicted of conspiracy to commit robbery. Conspiracy to commit a crime requires proof of an overt act committed in pursuance of the conspiracy. (§ 184.) The information alleged five different overt acts in furtherance of the conspiracy. Defendant contends the trial court erred in failing to instruct the jury that it could not convict him of conspiracy unless the jurors unanimously agreed regarding the required overt act. Defendant concedes that this

33

court has previously rejected the argument that jury unanimity regarding the overt act is required under state law. (*People v. Russo* (2001) 25 Cal.4th 1124, 1135 (*Russo*).) He contends, however, that *Russo* did not consider whether the federal Constitution requires the agreement of at least a majority of jurors on an overt act. Defendant cites cases holding that the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution require a jury trial and proof beyond a reasonable doubt on all elements of the offense (*Sandstrom v. Montana* (1979) 442 U.S. 510, 512-514; *Mullaney v. Wilbur* (1975) 421 U.S. 684, 697-698; *In re Winship* (1970) 397 U.S. 358, 363-364; *Morissette v. United States* (1952) 342 U.S. 246, 274-275) and the agreement of some minimum number of jurors (*Burch v. Louisiana* (1979) 441 U.S. 130 [conviction by a nonunanimous six-person jury violated defendant's right to a jury trial]; *Johnson v. Louisiana* (1972) 406 U.S. 356 [agreement of nine out of 12 jurors is sufficient]).

None of the cases cited by defendant calls into question our prior conclusion that the jurors need not agree unanimously on which overt act of a conspiracy was proved. *Russo* reasoned that the jury must agree on what crime was committed, not how that crime was committed. "Although the jury had to find at least one overt act, whether it was one or another of several possible acts only concerns the way in which the crime was committed, i.e., the theory of the case, not whether discrete crimes were committed. Thus, if the jurors disagreed as to what overt act was committed, and agreed only that *an* overt act was committed, they would still have unanimously found defendant guilty of a particular conspiracy." (*Russo*, *supra*, 25 Cal.4th at p. 1135.) Consistent with our reasoning in *Russo,* the United States Supreme Court has recognized that when a defendant's alleged conduct constitutes a single offense that may be committed in different ways, the federal Constitution does not require unanimity regarding how the crime was committed. (*Schad v. Arizona* (1991) 501 U.S. 624, 629-645 [due process

34

clause does not require a jury to agree unanimously whether a charge of first degree murder was committed by an intentional, premeditated killing or by felony murder]; *id.* at p. 649 (conc. opn. of Scalia, J.) ["it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission"]; see also *U.S. v. Kozeny* (2d Cir. 2011) 667 F.3d 122, 132 [jury need not agree on a single overt act to sustain a conspiracy conviction]; *U.S. v. Griggs* (7th Cir. 2009) 569 F.3d 341, 343 [same]; *U.S. v. Sutherland* (5th Cir. 1981) 656 F.2d 1181, 1202 [same].)

## D. Discovery order

Defendant contends that the discovery that the trial court ordered the defense to provide to the prosecution under section 1054.5 violated provisions of the federal and state Constitutions protecting his self-incrimination privilege, his right to due process, and his right to the effective assistance of counsel. Defendant recognizes that we rejected these arguments in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, but, to preserve the issue for federal review, he contends that case was wrongly decided and should be reconsidered. We decline to do so.

## E. Refusal of request to instruct that the jury must unanimously agree on the theory supporting the special circumstance verdict

The robbery and burglary special-circumstance allegations required the jury to find either that defendant intended to kill or that he was a major participant in the crime who exhibited reckless indifference to life. (§ 190.2, subds. (c) & (d).) The trial court refused to instruct the jury that it must agree unanimously on the theory that supported the special-circumstance allegation. Defendant acknowledges that when a charge is prosecuted under different *legal* theories, the jury need not agree unanimously on which theory applies. (See, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1025 [jury need not agree whether the defendant is guilty of murder based on a theory of direct culpability or a theory of

35

accomplice liability]; *People v. Edwards* (1991) 54 Cal.3d 787, 824 [jury need not agree unanimously which acts constitute lying in wait]; *People v. Failla* (1966) 64 Cal.2d 560, 567 [in burglary case, jurors need not agree unanimously regarding which felony the defendant intended at the time of entry].) Defendant contends he was prosecuted under a single legal theory with alternative *factual* theories: That (1) he ordered Morris to kill the victim, in which case he acted with intent to kill, or (2) he did not order the killing but was a major participant in the crime whose conduct evidenced a conscious disregard for life. Under these circumstances, defendant contends, the jury had to agree unanimously on the acts constituting the offense. He contends that the omission of the unanimity instruction violated his Sixth Amendment right to a jury trial and his Eighth Amendment right to heightened reliability in a capital case.

A unanimity instruction is required if there is evidence that more than one crime occurred, each of which could provide the basis for conviction under a single count. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281 [when evidence suggested more than one act of bribery, jury must agree unanimously which act was the basis for conviction]; see *People v. Beardslee* (1991) 53 Cal.3d 68, 92 ["A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses"].) But the unanimity instruction is not required " 'where multiple theories *or acts* may form the basis of a guilty verdict on one discrete criminal event.' " (*Russo*, *supra*, 25 Cal.4th at p. 1135, italics added.) "[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Id*. at p. 1132.) This is true even if the theories are based on different facts. (*People v. Jenkins*, *supra*, 22

36

Cal.4th at p. 1025 [unanimity instruction not required even where "different facts would support aiding and abetting liability and liability as a direct perpetrator"].)

Here, there was no evidence that more than one crime of murder was committed. Rather, the evidence left "room for disagreement as to exactly how that crime was committed or what the defendant's precise role was." (*Russo*, *supra*, 25 Cal.4th at p. 1132.) When a defendant's alleged conduct constitutes a single offense that may be committed in different ways, the federal Constitution does not require unanimity on how the crime was committed. (*Schad v. Arizona*, *supra*, 501 U.S. 624 [due process clause of U.S. Const. does not require jury to agree unanimously whether charge of first degree murder was committed by an intentional, premeditated killing or by felony murder].)

Defendant analogizes this case to *People v. Dellinger* (1985) 163 Cal.App.3d 284, 300-302, in which the Court of Appeal held that the defendant was entitled to a unanimity instruction because evidence suggested that he could have killed the victim either by blunt force trauma or by cocaine poisoning. *Dellinger* recognized that in most cases that have addressed the need for a unanimity instruction, there were not only multiple criminal acts that could have constituted the charged offense but also potentially multiple offenses. (*Id.* at p. 301.) In contrast, in *Dellinger* "there was only one offense and one victim but there were several hypotheses as to which act or acts caused [the victim's] death." (*Ibid.*) Nevertheless, the appellate court concluded that a unanimity instruction was required, explaining: "As long as there are multiple acts presented to the jury which could constitute the charged offense, a defendant is entitled to an instruction on unanimity." (*Ibid.*)

Even assuming that *Dellinger* was correctly decided, it is factually distinguishable from this case. Here, there was no dispute as to what acts caused the victim's death. We have previously concluded that *Dellinger*'s holding does

not extend to the situation in which the defendant, based on a single course of conduct, could have been convicted either as an aider and abettor to a murder or as the actual killer. (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 93.) Much less should it apply here, where there was no dispute that defendant was guilty of murder even though he was not the actual killer, and the only issue was whether he acted with the intent to kill or as a major participant with a reckless disregard for life. No unanimity instruction was required.

### F. Misreading of the instruction on the mental state element of the felony-murder special circumstance

The felony-murder special circumstance requires proof either that the defendant aided the murder "with the intent to kill," or that the defendant was a "major participant" in the crime and exhibited a "reckless indifference" to human life. (§ 190.2, subds. (c) & (d).) The written instructions provided to the jury correctly explained that "[a] defendant acts with reckless indifference to life *when* that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being." (Italics added.) But when reading the instruction, the trial court told the jury that "[a] defendant acts with reckless indifference to life *whether* [he] knows or is aware that his acts involve a grave risk of death to an innocent human being." (Italics added.) Defendant contends this instruction was erroneous because the court apparently substituted the word "whether" for "when," thereby indicating that reckless indifference could exist *whether or not* defendant knew or was aware that his acts caused a grave risk of death. He contends this instruction misstated the law and violated his rights under the Fifth and Sixth Amendments of the federal Constitution.

"The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke." (*People v. Mills* (2010) 48 Cal.4th 158, 200.) "[W]e

38

often have held that when erroneous oral instructions are supplemented by correct written ones, we assume the jury followed the written instructions, particularly when, as here, the jury is instructed that the written version is controlling." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1132; see *People v. Osband* (1996) 13 Cal.4th 622, 687 [noting that the jury was instructed to be " 'governed only by [each] instruction in its final wording, whether printed, typed or handwritten' "].) Here, the jury was instructed just before the beginning of deliberations that it would be given written instructions and that "the instructions may be typed, printed or handwritten.  Portions may have been added or deleted. . . .  Every part of the text of an instruction, whether typed, printed, or handwritten is of equal importance.  You are to be governed only by the instruction in its final wording."

Even if we did not assume that the jury understood that the written instructions were controlling, we would find no reasonable likelihood that the jury misunderstood the requirements for proof of the felony-murder special circumstance.  "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner."  (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)  Here, the instruction as read to the jury was, at most, ambiguous.  Both the prosecution and the defense focused on the "reckless indifference" element of the special circumstance in their arguments, and correctly stated that it required that defendant knew his act created a grave risk of death.  The prosecutor stated, "The definition of a reckless indifference to human life as taken from the jury instruction itself is that the defendant knows or is aware that his acts involve a grave risk of death to an innocent human being."  "Mr. Grimes knew there was a grave risk by going into this house with these people that Betty Bone was gonna be killed . . . .  So when

we talk about reckless indifference, knowing or being aware that your acts involve a grave risk . . . it's his knowledge and his awareness at the time that he goes into this residence as to what could potentially happen to this woman." Defense counsel correctly read the instruction to the jury: "I know I have read it, but I'll read it to you again. . . . A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being." "The law on the special circumstance above and beyond the first degree murder, is that Mr. Grimes must know or be aware that his acts, his conduct, what he does, involves a grave risk of death to an innocent human being." "That's how reckless indifference is defined, when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being." In light of counsel's repeated statements and the correct written instructions, there is no reasonable likelihood that the jury was misled by the trial court's misstatement.

### G. Instructions on the robbery element of the felony-murder special circumstance

The jury was instructed that the felony-murder special circumstance could not be found true unless, among other things, the prosecution proved "the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection." The jury was correctly instructed on the elements of robbery. Defendant nevertheless contends the robbery special-circumstance finding must be reversed because the trial court erred in instructing the jury with CALJIC No. 2.15, which told the jury that if it found defendant had been in possession of stolen property, that circumstance was not enough to support a robbery conviction and corroborating evidence of his guilt also was required, but "this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt." Defendant contends

40

that CALJIC No. 2.15 gave the jury an option of convicting him of robbery based on his possession of stolen goods plus some corroborating evidence, without finding all the elements of robbery. He also claims that it unconstitutionally lightened the state's burden of persuasion by permitting a conviction based on "slight evidence."

We have previously rejected the same arguments, concluding that CALJIC No. 2.15 appropriately permits — but does not require — jurors to infer guilt of burglary, robbery, or theft from the possession of stolen property plus some corroborating evidence, and that it does not violate due process or reduce the burden of proof. (See *People v. Gamache* (2010) 48 Cal.4th 347, 375-376; *People v. Parson* (2008) 44 Cal.4th 332, 355-356; *People v. Smithey* (1999) 20 Cal.4th 936, 975-977.)

Defendant relies upon federal conspiracy cases that have found a violation of due process when the jury was instructed, over the defendant's objection, that " '[o]nce the existence of the agreement or common scheme of conspiracy is shown, . . . slight evidence is all that is required to connect a particular defendant with the conspiracy.' " (*U.S. v. Partin* (5th Cir. 1977) 552 F.2d 621, 628, italics omitted; see *U.S. v. Durrive* (7th Cir. 1990) 902 F.2d 1221, 1228 [concluding that on appellate review, reviewing court must find " 'substantial evidence,' " rather than " 'slight evidence,' " connecting defendant to the conspiracy]; *U.S. v. Dunn* (9th Cir. 1977) 564 F.2d 348, 356-357 [clarifying that defendant's connection to the conspiracy need only be slight, but the connection must be proved beyond a reasonable doubt].) According to these cases, the "slight evidence" instruction " 'reduced the level of proof necessary for the government to carry its burden by possibly confusing the jury about the proper standard or even convincing jury members that a defendant's participation in the conspiracy need not be proved

41

beyond a reasonable doubt.' " (*U.S. v. Partin*, at p. 629, quoting *U.S. v. Hall* (5th Cir. 1976) 525 F.2d 1254, 1256.)

The problem with the instruction addressed in these federal cases is that it permitted the jury to conclude that the defendant was a participant in the conspiracy based only on "slight evidence." By contrast, CALJIC No. 2.15 permits conviction of theft-related offenses based upon evidence that the defendant was recently found in possession of stolen property *plus* additional, "slight," corroborating evidence. We have recognized that "[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt." (*People v. McFarland* (1962) 58 Cal.2d 748, 754.) Defendant's reliance on the federal conspiracy cases is therefore inapt.

## H. Admission of testimony from a jailhouse informant

Jonathan Howe, an inmate in the Shasta County Jail where defendant was incarcerated before trial, testified regarding admissions that defendant made to him. Before trial, defense counsel unsuccessfully moved to exclude Howe's testimony on several grounds, but he did not contend that the testimony should be excluded on the ground that Howe's plea agreement with the prosecution placed him under a strong compulsion to testify in accordance with his pretrial statements. Defendant contends his counsel rendered constitutionally deficient assistance in failing to move to exclude or strike Howe's testimony on this latter ground.

It is proper for the prosecution to present the testimony of a witness pursuant to a plea bargain if the witness believes that the agreement merely requires truthful testimony. (*People v. Garrison* (1989) 47 Cal.3d 746, 768;

42

*People v. Johnson* (1989) 47 Cal.3d 1194, 1229.) A defendant is denied a fair trial, however, if a plea agreement places the witness under "a strong compulsion to testify in a particular fashion." (*Garrison*, at p. 768.) Here, there is no evidence that Howe was under any compulsion to testify in accordance with his previous statements. Howe pleaded guilty to certain pending charges and agreed to a sentence of up to 24 months in exchange for the dismissal of other charges. The precise length of his sentence was to be decided by the same judge who was presiding in the present case, depending upon his determination as to whether Howe testified truthfully. The written plea agreement stated that Howe had "an obligation to do nothing other than to tell the truth, fully and accurately." He had been offered this same agreement before he came forward with information regarding defendant, except that the sentence would have been exactly 24 months.

Defendant argues that because the prosecution put Howe through a voice stress test and two polygraphs before his testimony, it was clear to Howe that the prosecution believed his pretrial statements were truthful and he therefore would have understood the agreement to testify truthfully to mean he was required to testify in accordance with his pretrial statements. The record demonstrates that any such notion was dispelled by the trial court's very clear direction that Howe was to tell the truth in court regardless of what he may have said previously. At his plea hearing, Howe told the judge it was his understanding that he would have to testify truthfully and "consistent with any report I've — I've made so far in this case." The judge clearly explained to him that he was to "testify truthfully whether or not it's consistent with any other statement. . . . [I]f telling the truth here, the actual truth, would be inconsistent with something you've previously said, that fact that it's inconsistent will not cause me to conclude that you're not being truthful. . . . In other words, I don't want you to think in any way, Mr. Howe, that for me to believe you're telling the truth that what you say here in

43

this courtroom has to be consistent with something you've said before. . . . In other words, do not say something that isn't true because it's consistent with what you said previously to law enforcement, in hopes that I will therefore conclude you're telling the truth here." Howe repeatedly affirmed that he understood. Given these facts, a challenge to Howe's testimony on the ground that he was under pressure to testify consistently with his former statements would have been unsuccessful. There being nothing in the record to demonstrate defense counsel performed deficiently by failing to challenge Howe's testimony on this ground, relief on direct appeal is unwarranted. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267; *People v. Pope* (1979) 23 Cal.3d 412, 426.)

## I. Trial court's refusal to impanel separate juries for the guilt and penalty phases

Defendant contends the trial court erred in refusing to impanel separate juries for the guilt and penalty phases. In support of his motion for separate juries, defendant presented a transcript of the testimony of California State University, Chico, Professor Edward Bronson in another case. Professor Bronson testified that the process of death qualification is prejudicial to a defendant in two ways. First, the jurors who are not eliminated tend to be less supportive of due process values than those who were eliminated. Second, the process of death qualification, by focusing on the death penalty and asking jurors to put themselves in the position of having found the defendant to be guilty, suggests to jurors that the defendant is guilty and that their duty is to find him guilty, and it may also desensitize them to their task. According to Professor Bronson, sequestered voir dire would "to some extent, minimize or mitigate those effects," but it would not eliminate them. The trial court denied defendant's motion, concluding that much of the potential prejudice resulting from death qualification could be avoided if the court used individual, sequestered voir dire and if the court and counsel were

careful to impress upon the potential jurors that defendant's guilt was not a foregone conclusion.

Section 190.4, subdivision (c), requires the same jury to decide guilt and penalty absent good cause. We review the trial court's ruling for abuse of discretion. (*People v. Bivert* (2011) 52 Cal.4th 96, 108.) Professor Bronson's testimony supported only the conclusion that death-qualified juries *in general* tend to be more likely to convict. "This court and the United States Supreme Court have repeatedly rejected the claim that separate juries are required because jurors who survive the jury selection process in death penalty cases are more likely to convict a defendant." (*People v. Davis* (2009) 46 Cal.4th 539, 626; see *Lockhart v. McCree* (1986) 476 U.S. 162; *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 68-69.) Nothing in Professor Bronson's testimony or the studies he cited provided any information significantly different from that which was considered in our previous decisions. Indeed, Professor Bronson testified that studies undertaken after *Lockhart* and *Hovey* reached conclusions similar to those of the studies addressed in those cases and he was not able to cite any significant new developments in the research. Thus, Professor Bronson's testimony provided no basis for the trial court to depart from the holdings in these prior cases. Defendant offered no evidence to establish good cause for a separate penalty jury based on the particular circumstances of this case. The trial court took steps to reduce any prejudice to defendant that might result from the jury selection process, including conducting individual, sequestered voir dire. We find no abuse of discretion.

### J. Alleged deficient performance by counsel in advising defendant to reject plea bargain

Defendant contends that his trial counsel performed deficiently in advising him to reject a plea bargain that would have avoided the death penalty before counsel was sufficiently familiar with the case to give such advice. Because the

45

record does not establish what counsel knew about the case at the time the plea bargain was refused or what advice counsel gave to defendant, defendant has not shown that his counsel's actions fell below an objective standard of reasonableness.

Defendant was charged with murder and special circumstances in October of 1995 and pled not guilty. Fifteen months later, in January of 1997, the District Attorney of Shasta County, Dennis Sheehy, notified defendant's counsel that he had decided not to seek the death penalty. Because defendant was not the actual killer, District Attorney Sheehy did not believe that a jury would impose the death penalty. Shortly thereafter, Sheehy resigned and McGregor Scott replaced him. On May 23, 1997, in response to defendant's *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118), the trial court appointed new counsel, Richard Maxion, for defendant. Two weeks after Maxion was appointed, on June 6, District Attorney Scott informed the court he would seek the death penalty as of June 27 unless, before that date, defendant decided to plead guilty to special circumstances murder. In court on June 27, defense counsel stated that his client would not plead guilty and the prosecutor announced that he would seek the death penalty.

Prior to trial, defendant moved to prohibit the prosecution from seeking the death penalty on a number of grounds, including claims that the decision to seek the death penalty constituted vindictive prosecution and that defendant was denied effective assistance of counsel because Attorney Maxion had not been given enough time to attempt to persuade the district attorney not to seek death. At the hearing on defendant's motion, the trial court rejected the claim that the prosecution's offer to allow defendant only three weeks to decide whether to plead guilty in exchange for a life sentence violated his right to effective assistance of counsel because it was made only two weeks after new counsel was appointed.

46

Testimony established that defense counsel had agreed to the deadline, and that the prosecutor would have given him more time if he had asked for it.

Here, defendant contends that his counsel rendered constitutionally deficient assistance in advising him not to accept the plea before he had adequately familiarized himself with the case. A defendant has the right to effective assistance of counsel in deciding whether to accept or reject a proposed plea agreement. (See *In re Alvernaz* (1992) 2 Cal.4th 924, 937.) An attorney's performance is constitutionally deficient if (1) it falls below an objective standard of reasonableness under prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-696.) "[A] defense attorney's simple misjudgment as to the strength of the prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction, among other matters involving the exercise of counsel's judgment, will not, without more, give rise to a claim of ineffective assistance of counsel." (*In re Alvernaz*, at p. 937.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569; see *People v. Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267.)

The record does not show how much counsel knew about the case, how counsel advised defendant, or what defendant's response was. There is no evidence that he did not advise defendant to accept the offer. Defendant contends that the record demonstrates that counsel could not have had a sufficient understanding of the case to adequately advise defendant at the time that defendant declined the plea offer and that, if properly advised, defendant would have accepted the plea. He bases this conclusion on the fact that during jury selection

47

(more than a year after defendant declined the offer), when counsel was fully prepared for trial, counsel told the court that defendant was willing to plead guilty and accept a sentence of life without the possibility of parole. But the record does not establish that defendant's decision to plead guilty was based on counsel's additional knowledge about the case. Any number of circumstances unrelated to counsel's representation may have occurred after defendant's rejection of the plea offer and before the start of trial that could have led defendant to change his mind.[8] Consequently, defendant has failed to show that counsel's conduct fell below professional norms or that defendant would have pled guilty if properly advised.

### K. Prosecution's decision to seek death unless defendant pled guilty to murder and the special circumstance

Defendant contends he was denied due process when the district attorney decided to reverse the decision of the prior district attorney and to seek the death penalty unless defendant pleaded guilty to the charge of murder with special circumstances. As explained above, after the district attorney's office notified defendant that it would not seek the death penalty, a new district attorney was appointed. He reconsidered that decision and decided to seek the death penalty, but gave defendant the opportunity to plead guilty to the charges of murder with special circumstances and serve a sentence of life without possibility of parole. Defendant argues his right to due process was violated because the district attorney sought the death penalty after defendant refused to plead guilty, thereby punishing him for exercising his right to a jury trial.

---

[8] For example, during this time period witness Howe came forward to offer evidence that defendant admitted he directed Morris to kill Bone, and trial counsel became aware that Howe might be called as a witness.

48

Under the due process clause, prosecutors may not "tak[e] certain actions against a criminal defendant, such as increasing the charges, in retaliation for the defendant's exercise of constitutional rights. [Citations.] It is not a constitutional violation, however, for a prosecutor to offer benefits, in the form of reduced charges, in exchange for a defendant's guilty pleas, or to threaten to increase the charges if the defendant does not plead guilty. [Citations.] In the pretrial setting, there is no presumption of vindictiveness when the prosecution increases the charges or, as here, the potential penalty. [Citations.] Rather, the defendant must 'prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something the law plainly allowed him to do.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 98.)

Absent proof of vindictiveness or other improper motive, increasing the charges or punishment when a plea bargain is refused does not constitute unconstitutional punishment or retaliation for the exercise of a defendant's legal rights. "[I]n the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." (*Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363.) The district attorney was free to change the decision made by his predecessor not to seek the death penalty, and that decision does not raise "a presumption of vindictiveness." (*United States v. Goodwin* (1982) 457 U.S. 368, 382; see *id.* at pp. 381-385.) "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." (*Id.* at p. 382.)

In the present case, the record establishes nothing more than that a plea bargain was offered and refused. The trial court conducted a hearing at which the

district attorney explained why he disagreed with the decision of his predecessor, who had considered the decision a close call but believed that a jury was not likely to return a death verdict. The new district attorney reconsidered that decision after a thorough review of the case. Following a hearing at which both the former and current district attorneys testified, the trial court concluded that the decision was not arbitrary or capricious and that there was no element of retaliation in the decision. Nothing in the record supports defendant's argument to the contrary.

### L.  Cumulative error

Defendant contends that the guilt and special circumstances verdicts should be reversed based on the cumulative effect of the prejudice resulting from all alleged errors, even if each is not prejudicial in itself. We have found only one error — the trial court's exclusion of statements by John Morris to Misty Abbott and Albert Lawson — and we concluded that this error was prejudicial only at the penalty phase, not at the guilt phase. Consequently, there is nothing to cumulate and hence there can be no cumulative prejudice.

### M.  Waiver of jury trial on prior conviction allegations

Defendant contends that the trial court's true findings on certain noncapital sentencing allegations must be vacated because his waiver of a jury trial was involuntary. The information contained a number of noncapital sentencing allegations, including allegations that defendant committed the charged crimes while on parole (§ 1203.085, subd. (b)), that he had been convicted of a serious or violent felony within the meaning of the Three Strikes law (§ 1170.12), and that he had served four prior prison terms (§ 667.5, subd. (b)). Prior to trial, defense counsel moved to bifurcate proceedings on these allegations and offered to waive

50

jury trial. The trial court received defendant's waiver of a jury trial on these allegations. Subsequently, during guilt phase deliberations, the court and defense counsel reviewed the transcript of defendant's waiver and agreed that the waiver was sufficient and no further advisements need be given. The allegations were tried to the court, which found that defendant had been convicted of a serious or violent felony within the meaning of the Three Strikes law and that he had served four prior prison terms. Based on these findings, the trial court doubled defendant's sentence under the Three Strikes law for the offense of unlawful driving or taking of a vehicle, and imposed four one-year terms for the four prior prison term enhancements.

Defendant contends that his waiver of a jury trial on the allegations was invalid because the trial court and counsel informed him that he was required to waive that right so the jury would not be exposed to evidence of his criminal history at the guilt phase. This advisement was misleading, defendant contends, because defendant could have retained his right to a jury trial and the trial court could have bifurcated trial on the sentencing allegations, so that the jurors would not have heard evidence of his history until after they had decided his guilt on the substantive charges. (See *People v. Calderon* (1994) 9 Cal.4th 69, 72.)

Defendant has forfeited this claim based on his failure to object in the trial court. "[T]he deprivation of the statutory right to jury trial on the prior prison term allegations does not implicate the state or federal constitutional right to jury trial. Absent an objection to the discharge of the jury or commencement of court trial, defendant is precluded from asserting on appeal a claim of ineffectual waiver of the statutory right to jury trial of prior prison term allegations." (*People v. Vera* (1997) 15 Cal.4th 269, 278; see *People v. Towne* (2008) 44 Cal.4th 63, 74-79

51

[federal constitutional right to a jury trial does not extend to allegations that a defendant has suffered a prior conviction or served a prior prison term].) Here, after reviewing the transcript of defendant's waiver, defense counsel expressly agreed with the trial court that defendant's waiver was sufficient.

Furthermore, the claim fails on the merits. There is no evidence in the record that defense counsel advised defendant that trial on the sentencing allegations could not be bifurcated unless defendant waived his right to a jury trial. The record does not show what advice counsel gave to defendant. There was a brief pause in the proceedings while defendant consulted with counsel before hearing the trial court's advisements and waiving jury trial on the allegations. The trial court explained to defendant that "your attorneys have indicated they want this jury, when this jury is deciding the issue of whether or not the People have proven the charges against you beyond a reasonable doubt, to be influenced in any way by also considering the allegations of these prior felony convictions and related matters. . . . In order to avoid having the jury deal with that issue, your attorneys are recommending to you, apparently, that you waive your right to have the jury decide that issue, and that you have those issues, as to each one of these prior special allegations, be decided solely by the court." Contrary to defendant's contention, the court never stated that waiving a jury trial was the only way to avoid exposing the jury to defendant's criminal history during the guilt phase. Rather, the court stated only that waiving a jury trial was the means that defendant's attorneys were recommending to avoid such exposure. That statement was not incorrect or misleading, and does not render defendant's waiver involuntary.

52

### N. Sufficiency of evidence to prove four prior prison term allegations

Defendant claims the trial court improperly found four one-year enhancement allegations for service of prior prison terms to be true when the evidence showed that he had served only three separate prison terms. Section 667.5, subdivision (b), provides for a one year sentence enhancement "for each prior separate prison term" served by the defendant. A "prior separate prison term" is "a continuous completed period of prison incarceration imposed for the particular offense alone or in combination with concurrent or consecutive sentences for other crimes . . . ." (§ 667.5, subd. (g).) Under this provision, "a defendant who has served concurrent or consecutive prison sentences on various commitments is deemed to have served only one prior prison term for the purpose of the enhancement provisions of Penal Code section 667.5." (*People v. James* (1980) 102 Cal.App.3d 728, 733; see also *People v. Perez* (1992) 4 Cal.App.4th 893, 911.)

As respondent concedes, the evidence shows that defendant served consecutive terms on two of the four felony convictions alleged — his convictions for being a felon in possession of a firearm and escape (Stanislaus County case Nos. 265702 & 265697). Accordingly, he did not serve "separate" terms for these offenses within the meaning of section 667.5, subdivision (b). Therefore, the trial court's true finding on one of the section 667.5, subdivision (b), allegations must be vacated.

53

### III. DISPOSITION

We reverse the judgment of death, and we set aside one of the findings under section 667.5, subdivision (b).  The matter is remanded for a new penalty determination and for resentencing.  The judgment is affirmed in all other respects.

**KRUGER, J.**

**WE CONCUR:**

**WERDEGAR, J.**
**LIU, J.**
**CUÉLLAR, J.**

**CONCURRING AND DISSENTING OPINION**
**BY CANTIL-SAKAUYE, C. J.**

This court originally affirmed the judgment of death in this case, rejecting defendant Gary Lee Grimes's argument that the exclusion of certain hearsay statements at his trial amounted to prejudicial error. After granting rehearing, a majority of this court now agrees with defendant that these statements should have been admitted under the exception to the hearsay rule applicable to statements against interest. (Evid. Code, § 1230.) The majority also concludes that although the exclusion of these statements was harmless at the guilt phase, the perceived possibility of a different outcome at the penalty phase means that the judgment of death must be reversed.

I respectfully disagree with the majority's assessments of error and prejudice. This court was correct when it originally found no reversible error in the trial court's rulings as to the disputed statements. On rehearing, I have given careful reconsideration to these issues and find even more reason now to conclude that the trial court did not abuse its discretion in excluding one of these statements, and no reasonable possibility that introduction of the other proffered evidence would have affected the outcome at the guilt or penalty phases of defendant's trial. Therefore, while I concur with the majority insofar as it affirms the guilty verdict and the special circumstance findings, I dissent from its reversal of the judgment of death.

1

Prior to trial, defendant sought admission of statements coperpetrator John Morris made to an acquaintance, Misty Abbott, on the day of the killing, and to a fellow inmate, Albert Lawson, while Morris and Lawson were held in jail a few days later. Morris committed suicide prior to trial and was therefore unavailable to testify. As to both conversations, defendant's offer of proof included several statements made by Morris that were clearly against Morris's penal interest. According to Abbott, Morris told her that "he murdered the little old lady," that "it didn't work . . . strangling her . . . and so he stabbed her," and that "she wouldn't die choking her, so he had to get a knife from the kitchen." Morris also told Lawson that he "killed that old lady," saying, "I stabbed her. Also I grabbed her by the throat." The trial court correctly recognized that these statements were against Morris's penal interest when made, and thus found them admissible under the statement against interest exception to the hearsay rule.

Defendant argues that the trial court also should have admitted other hearsay statements Morris made to Abbott and Lawson, the inculpatory attributes of which are far less obvious. According to the offer of proof by defendant's trial counsel, when a detective asked Abbott if defendant and a third perpetrator, Patrick Wilson, had participated in the killing, her response was, "no, Johnny [Morris] told her after he quote did the lady, unquote that [defendant] and [Wilson] looked at him as if they were saying, what in the hell are you doing, dude." Defendant also offered Morris's statement to Lawson that, in connection with the home invasion and attack, defendant and Wilson "were in the house but took no part in the actual killing." Defendant asserts that these statements by Morris, although hearsay, also qualify for the against-interest exception, and claims that their exclusion by the trial court amounts to reversible error at both the guilt and penalty phases. The majority agrees with defendant, at least in part. I do not.

2

The exception to the hearsay rule for statements against interest appears at Evidence Code section 1230.  It provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)  "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character."  (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)  The against-interest exception to the hearsay rule is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant" (*People v. Leach* (1975) 15 Cal.3d 419, 441; see also *People v. Duarte*, at p. 612), and "a declaration against penal interest must be 'distinctly' against the declarant's penal interest" (*People v. Shipe* (1975) 49 Cal.App.3d 343, 354; see also *People v. Traylor* (1972) 23 Cal.App.3d 323, 330-331).  Whether or not a statement is against penal interest can be determined only by considering "the statement in context."  (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).)  Understood in context, even a statement that admits to criminal wrongdoing may not be against the declarant's penal interest when made.  (*People v. Duarte*, at pp. 611-612.)

A ruling by the trial court as to whether a hearsay statement is admissible as being against the declarant's penal interest is reviewed for abuse of discretion. (*Lawley*, *supra*, 27 Cal.4th at p. 153.)  Whether a statement meets the criteria for this exception "goes to the core of the question of basic trustworthiness, and hence must be deemed entrusted to the court's discretion."  (*People v. Gordon* (1990) 50

3

Cal.3d 1223, 1252.)  Such a ruling "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  In applying the abuse of discretion standard, a reviewing court does not wholly replace the trial court's judgment with its own; if a reasonable basis existed to exclude a statement, that means the trial court did not abuse its discretion in doing so, even assuming that a reasonable argument also existed for admitting it.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 144 [observing that in circumstances where the trial court reasonably could have chosen to admit or exclude evidence, it does not abuse its discretion by choosing either path]; *People v. Gordon*, at p. 1253 [same].)

The majority acknowledges that the abuse of discretion standard applies here — but then spots what it perceives as a material mistake of law by the trial court and on that basis conducts what amounts to *de novo* review.  My review of the record on rehearing leads me to disagree with this approach.  The trial court correctly ascertained the crux of the declaration against penal interest rule — that a statement must be "specifically disserving" of the declarant's penal interest to qualify for admission under this exception to the hearsay rule (*People v. Leach*, *supra*, 15 Cal.3d at p. 441) — and the record does not establish that the judge misapplied this principle in excluding Morris's statement about the looks he received from defendant and Wilson after killing the victim.[1]  Applying the

---

[1] The original majority opinion in this matter observed that the trial court relied on *People v. Gatlin* (1989) 209 Cal.App.3d 31 (*Gatlin*), a somewhat factually inapposite case, in ruling on the admissibility of Morris's statements, and noted that the trial court may have endorsed the categorical principle (as the majority phrased it) "that a declarant who has admitted to murder does not enhance his personal culpability by claiming he acted alone" — an assertion that, we observed, may not be accurate under some circumstances.  Accordingly, the

*(Footnote continued on next page.)*

appropriate standard of review, I would hold that the trial court did not make an arbitrary or absurd decision when it excluded this statement because the trial court reasonably could have found that due to this statement's inherent ambiguity, defendant failed to show that it was distinctly and specifically against Morris's penal interest when made. (See *Andrews v. United States* (D.C. 2009) 981 A.2d 571, 576 ["if there are two possible interpretations of [a purported] statement [against penal interest] . . . one of which would subject [the declarant] to criminal liability while the other would not, the necessary indicia of trustworthiness are absent"].)

---

*(Footnote continued from previous page.)*

majority recognized that it could affirm on any ground in the record, before concluding that the trial court did not abuse its discretion in excluding Morris's statement to Abbott about the looks he had received, and determining that any assumed error in the exclusion of other statements was harmless.

A rehearing requires a fresh look at the record. This review establishes that regardless of whether the facts of *Gatlin*, *supra*, 209 Cal.App.3d 31 were on all fours with those involved here, the trial court gleaned from that case the correct principle that "the Evidence Code section 1230 declaration against interest exception applies only to that part of the statement which is specifically disserving to the — the declarant." (See *Gatlin*, at p. 44 ["Section 1230 is not applicable to evidence of any statement not itself specifically disserving to the interests of the declarant"].) Meanwhile, to the extent that the trial court may have made categorical assertions regarding certain types of hearsay statements, the record shows that the court was contemplating circumstances in which a declarant, having admitted to a crime, also said that "nobody else there had any part of it" or that others "did or did not assist him" — phrasing that parallels some, but not all, of the contested statements here.

Therefore, regardless of whether the trial court may have been mistaken on a point of law pertinent to Morris's other statements, I would not assume, as the majority does, that the trial court labored under a misunderstanding of the law in excluding Morris's statement about the looks he received from defendant and Wilson. The inherent ambiguity of this statement (as will be examined *post*) meant that it was subject to exclusion on the simple basis that defendant had not shown that it was specifically disserving.

5

In other statements he made to Abbott, Morris told her that he had killed the victim by strangling and stabbing her. The trial court properly found these statements admissible. In contrast, Morris's tangential remark that related how his cohorts reacted to the killing once it was complete does not unambiguously possess the distinctly incriminating connotations that the against-interest exception demands. Significantly, Morris's statement did not explain *why* he thought defendant and Wilson looked at him in the manner he described. Morris's description of the looks as signifying "what in the hell are you doing, dude" admits to several interpretations. Among them, the statement may have reflected Morris's impression that defendant and Wilson were surprised by the difficulty that Morris had in killing the victim. Or Morris could have believed that defendant and Wilson were annoyed or frustrated that the killing had taken as long as it did. Or Morris could have perceived them as amused by the circumstances of the killing; "what in the hell are you doing" does not necessarily describe a negative reaction, depending on how Morris delivered these words. Other interpretations, even less disserving of Morris's penal interest, also are possible. Under any of these interpretations, viewed in context Morris's observation regarding the reactions of others to the violent actions he described in his *other* statements to Abbott was a collateral assertion that was insufficiently disserving of his penal interest as to possess the trustworthiness and reliability demanded by the against-interest exception.

The most disserving construction of this statement would cast it as an implicit admission by Morris that he alone had made the decision to kill the victim — causing defendant to register surprise at the fact that Betty Bone was killed at all. But this is a dubious interpretation of Morris's statement. As the majority observes, defendant himself admitted to police that, knowing a robbery was planned, he helped Morris find his gun, and that before they entered the victim's

6

residence Morris saw a woman taking out her trash and said, " 'Fuck it, we'll just fuckin' kill her an' look at the house . . . .' " (Maj. opn., *ante*, at p. 27.) Furthermore, in his statement to police defendant said that he had observed Morris strangling Bone, heard Morris say that she would not die, saw Morris look for a knife in the kitchen, and then saw or heard him stabbing Bone. Given these facts, it seems unlikely that defendant was surprised afterward at the fact of the killing. More fundamentally, even assuming the possibility of such an interpretation, the presence of other readings of the statement whereby it was not specifically and distinctly against Morris's penal interest when made means that the trial court did not abuse its discretion in declining to admit the statement.[2]

The majority acknowledges the ambiguous character of this statement, and therefore cannot and does not state that it was "specifically disserving," as our precedent demands for the admission of a statement, or a portion of a statement, under Evidence Code section 1230. (*People v. Leach*, *supra*, 15 Cal.3d at p. 441; see also *People v. Duarte*, *supra*, 24 Cal.4th at p. 612.) Grasping for an alternative rationale, the majority nevertheless finds the against-interest exception applicable because "under any conceivable interpretation of the statement, it tended to underscore Morris's responsibility for the crime, rather than diminish it," the

---

[2]    The majority asserts that "no plausible reason" has been offered why this statement should be regarded as "any less trustworthy" than Morris's other statements to Abbott, and that it can think of none. (Maj. opn., *ante*, at pp. 24-25.) The ambiguity of Morris's surmise about looks he received, which even the majority cannot say is specifically disserving — as juxtaposed against statements in which Morris told Abbott in no uncertain terms that he had personally strangled and stabbed the victim — supplies such a reason. And of course, the majority's point merely sidesteps the fact that the crucial inquiry in applying the declaration against interest exception concerns whether the statement is "specifically disserving," not a more generic trustworthiness assessment. (*People v. Leach*, *supra*, 15 Cal.3d at p. 441.)

statement "elaborated on [Morris's] confession," and the statement was "not practically separable from the remainder of [Morris's] statements" to Abbott.**3** (Maj. opn., *ante*, at p. 22.)  As I will explain, the last of these assertions is demonstrably false.  The other two simply replace the existing standard for declarations against interest with a nebulous and less rigorous approach that will be more difficult for courts to apply and less likely to screen out untrustworthy hearsay.

With regard to the majority's assertion that Morris's statement about the looks he received was "not practically separable from the remainder of [Morris's] statements" to Abbott (maj. opn., *ante*, at p. 22),  I cannot see how this is so. Unlike situations in which a contextual fact is "inextricably tied to and part of" a specifically disserving statement (e.g., *People v. Samuels* (2005) 36 Cal.4th 96, 121), in which case stripping the contextual fact would require alteration of the incriminating statement itself, Morris's statement describing the looks he received was readily separable from his admissions that he had strangled and stabbed the victim.  It takes no great leap of imagination to appreciate how Abbott could have testified fully and coherently to Morris's statements about strangling and stabbing

---

**3**     The majority also describes this statement as "simply an elaboration on Morris's acknowledgement that defendant and Wilson did not participate in the murder," and references the trial court's supposedly similar "view[]" of the statement. (Maj. opn., *ante*, at p. 22, fn. 5.)  In excluding the statement, the trial court stated, "The next statement that was mentioned was where Mr. Morris allegedly told Ms. Abbott that Mr. Grimes and Mr. Wilson did not take part in the killing and some other details regarding that, again, that does not appear at all to be disserving of Mr. Morris' interest."  This shorthand description of defendant's vague offer of proof did not involve any measured "view" regarding the meaning of Morris's statement about the looks he received, and does not establish that the trial court perceived Morris's statement as unambiguous.

8

Bone without also testifying to Morris's collateral statement about the looks he received from defendant and Wilson afterward.

As for the majority's other rationales, the accepted test for admissibility of a statement under the against-interest exception is not whether the statement somehow tends to "underscore" the declarant's responsibility for a crime, nor whether it "elaborate[s] on" an actual statement against interest (maj. opn., *ante*, at p. 22), but the more stringent standard of whether the statement was so "specifically disserving" of the declarant's interests "that a reasonable man in his position would not have made the statement unless he believed it to be true." (*People v. Leach*, *supra*, 15 Cal.3d at p. 441; Evid. Code, § 1230.) As discussed above, this standard has not been met here. By watering down the standard for admission under the against-interest exception, the majority erroneously "assumes that a declaration against interest involves a truth-telling frame of mind which carries over to statements other than those against interest. But the presence of the declaration against interest does not add to the trustworthiness of neutral and self-serving statements. They would seem equally trustworthy or unreliable whether accompanied by a declaration against interest or not." (Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule* (1944) 58 Harv. L.Rev. 1, 62; see also *Williamson v. United States* (1994) 512 U.S. 594, 600 ["The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability"].)

The majority's expansion of the against-interest exception represents a significant and, in my view, misguided shift in our interpretation of Evidence Code section 1230. In effect, the majority endorses a form of bootstrapping whereby a specifically disserving statement can tow related collateral assertions within a larger, generally incriminating narrative into the against-interest

9

exception. This is not merely a "contextual approach," as the majority characterizes it (maj. opn, *ante*, at p. 21), since the "specifically disserving" standard *already* requires the consideration of a statement's context. (E.g., *People v. Duarte*, *supra*, 24 Cal.4th at p. 612.) Instead, the majority's invocation of "context" provides cover for its dilution of the prevailing rule. This approach raises difficult questions about the necessary logical and narrative tethers, points on which the majority provides little guidance. It also retreats from our formerly rigorous enforcement of the "specifically disserving" standard (*People v. Leach*, *supra*, 15 Cal.3d at p. 441; see *Lawley*, *supra*, 27 Cal.4th at p. 154 [finding no abuse of discretion in the trial court's exclusion of evidence that did not meet this standard]; *People v. Duarte*, *supra*, 24 Cal.4th at pp. 612-614, 618 [finding error in the trial court's decision to admit, as a statement against interest, a statement containing portions that were not "specifically disserving"]; *Leach*, at pp. 441-442), thereby abandoning a position consistent with the one taken by the United States Supreme Court in its construction of the parallel federal rule, Federal Rules of Evidence, rule 804(b)(3) (28 U.S.C.) (*Williamson v. United States*, *supra*, 512 U.S. at pp. 600-601 ["the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"].) The requirement that each hearsay statement within a narrative be specifically and distinctly disserving to gain admission under the against-interest exception is not a mere formalism, for it serves the greater purpose of screening out the unreliable hearsay that clever or careless declarants often interweave with truly inculpatory facts. (See *id*. at pp. 599-600 ["One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature"].) The majority's approach compromises this screening function. In all, by substituting propinquity for the particular indicia of trustworthiness required of

10

a statement against interest, and thereby adding a vague and imprecise gloss to what previously had been a more clear rule, the majority needlessly complicates the law regarding statements against interest and opens the door to potentially untrustworthy hearsay.

Our decision in *Lawley*, *supra*, 27 Cal.4th 102, applied the against-interest exception more faithfully and establishes that there was no abuse of discretion here. The defendant in *Lawley* was convicted of murder based on evidence that he hired one Seabourn to kill the victim. We held that the trial court did not abuse its discretion in admitting Seabourn's hearsay statement that he was hired to and did kill the victim as a statement against interest, while excluding Seabourn's statements that he had been hired by the Aryan Brotherhood for the hit, and that "an innocent man was in jail for the crime." (*Id*. at p. 154.) We reasoned that these latter two statements did not specifically disserve Seabourn's penal interest — even though they arguably underscored Seabourn's responsibility for the crime by adding details regarding his involvement, and elaborated on Seabourn's core admission of involvement in a murder for hire. (*Id*. at pp. 154, 155, fn. 21.) The same reasoning applies to Morris's statement about the looks he received after the killing. Even though Morris's statement may have a connection to specifically disserving statements, it was itself not distinctly and specifically disserving when viewed in context, and therefore does not qualify for the against-interest exception.[4]

---

[4] Furthermore, in *Lawley*, *supra*, 27 Cal.4th 102, this court did not press the limits of its imagination to devise some conceivable way that Seabourn's collateral statements could have incriminated him. (His statement concerning the Aryan Brotherhood, for example, might have suggested gang ties.) With good reason; a statement is not specifically and distinctly disserving in every instance where judges can conceive, after the fact, some possible though nonobvious basis upon which the statement could have had an incriminating effect. (See *People v.*

*(Footnote continued on next page.)*

11

In sum, whereas our decision in *Lawley*, *supra*, 27 Cal.4th 102, as well as our prior rulings construing the against-interest exception appropriately recognized the difference between specifically disserving statements and statements that are merely collateral, today's decision regrettably blurs this distinction and fails to apply the proper standard of review in concluding that the trial court erred. I therefore disagree with its finding of error.

This disagreement also leads me to depart from the majority in its assessment of prejudice. The exclusion of Morris's "what in the hell are you doing" statement forms the backbone of the majority's prejudice analysis. But as explained above, the trial court did not abuse its discretion, and therefore did not err, in excluding this statement. With regard to the trial court's exclusion of the other disputed evidence, even assuming error by the trial court, no reasonable possibility exists that the error affected the outcome at the guilt phase or the penalty phase of defendant's trial.

The most reasonable interpretation of the proffered statement that defendant was in another part of the house and did not participate in the "actual killing" (and whatever similar statement Morris may have made to Abbott, as to which defendant's offer of proof was not clear) was that he did not participate in the *act* of killing. But the prosecutor never argued that defendant participated in the act of killing, making this clarification beside the point. The evidence presented at trial

---

*(Footnote continued from previous page.)*

*Traylor*, *supra*, 23 Cal.App.3d at p. 331 ["The test [for applying the exception] is not whether the statement could provide a link in a chain of evidence leading to the declarant's criminal liability, but whether the statement satisfies the reason why declarations against interest are admitted as an exception to the hearsay rule"].) The reasonable person approach codified by Evidence Code section 1230 does not presume such omniscience by the declarant.

portrayed Morris as the actual killer, and the prosecution presented no evidence that defendant had actually participated in the homicidal act. In his statement to the police defendant said he was present in the house while Morris killed Bone, but asserted that he did not participate in the killing. Misty Abbott's testimony concerning Morris's description of how he killed the victim cast Morris as the sole person responsible for the actual killing.[5] Likewise, defendant's out-of-court statement to jailhouse informant Jonathan Howe was that he never personally touched the victim and his DNA would not be found on the body. No DNA or other physical evidence linked defendant to the actual killing. As the majority observes, the prosecution did present testimony from Howe that defendant admitted he had ordered Morris and Wilson to kill the victim. However, the challenged evidence would not have countered this testimony. Morris's statement that defendant did not participate in the "actual killing" did not conflict with Howe's testimony that defendant admitted he ordered Morris to kill Bone.[6] In

---

[5] In one colloquy, Abbott testified as follows:
"Q: Did Mr. Morris tell you on the way to the lake that he had murdered the old lady?
"A: Yes.
"Q: Okay. And on the way to the lake, did Mr. Morris say that he had stabbed the old lady?
"A: Yes.
"Q: That he tried to strangle her first, Mr. Morris tried to strangle her first?
"A: Yes.
"Q: And Mr. Morris told you that the lady wouldn't die; is that right?
"A: That's right.
"Q: And Mr. Morris told you then that he went to the kitchen and got a knife and stabbed her?
"A: Yes."

[6] Although Morris's grandfather testified that Morris had told him that others were wrongly blaming him for the murder, that statement was admitted only for

*(Footnote continued on next page.)*

short, had the jury heard a representation by Morris that defendant was not involved in the actual killing, this additional evidence would not have impacted the arguments made at trial nor the jury's assessment of the evidence as a whole, whether at the guilt phase or the penalty phase.

This court's decision to grant rehearing in this case has led to a careful reconsideration of defendant's claims of error, as it should. To me, however, this review leads back to the same conclusion we drew before — that defendant's trial involved no errors that require reversal of the judgment of death. In holding otherwise, the majority renders the against-interest exception less coherent and spots error and prejudice where none exist. I therefore dissent.

CANTIL-SAKAUYE, C. J.


WE CONCUR:

CHIN, J.
CORRIGAN, J.

---

*(Footnote continued from previous page.)*

purposes of impeachment and, in any event, nothing in it suggested that defendant assisted Morris in killing Bone.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Grimes

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076339
**Date Filed:** August 22, 2016

_____

**Court:** Superior
**County:** Shasta
**Judge:** Bradley L. Boeckman

_____

**Counsel:**

Cliff Gardner, under appointment by the Supreme Court, Catherine White and Lazuli Whitt for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Kenneth N. Sokoler and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

Michael J. Hersek, State Public defender, Barry P. Helft, Chief Deputy State Public Defender, and Nina Rivkind, Deputy State Public Defender, for Office of the State Public Defender as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cliff Gardner
Law Office of Cliff Gardner
1448 San Pablo Avenue
Berkeley, CA  94702
(510) 524-1093

Stephanie A. Mitchell
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-8044