Filed 2/13/25  P. v. Medrano CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B332155 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. VA150959-03 |
| ROBERT MEDRANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger T. Ito, Judge.  Affirmed.

Theresa O. Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Nicholas J. Webster and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Robert Medrano of murder and felony evasion.  Medrano challenges the sufficiency of the evidence against him and the use of incriminating accomplice statements at trial.  We affirm.  Undesignated code citations are to the Penal Code.

I

We review the evidence favorably to the prevailing prosecution.

Late in the evening on September 1, 2018, a white flatbed truck drove past a home in Whittier known as a hangout for the Los Nietos gang.  The victim, Marcellino Chavez, had arrived at the home moments before.  Surveillance video shows the truck make a U-turn and drive back towards the house.  Two men with hoodies jump out of the truck.  They have guns in their hands and bandanas covering their faces.

One of them approaches a man sitting in his car near the garage.  The assailant puts a gun to the man's head and orders him to empty his pockets.  The man says he has nothing, and the assailant walks towards his comrade, who is confronting another man in the driveway.

Someone says, "if I have to go in after him, I will."  The assailants go into the house.

Meanwhile, the truck gets closer and "starts lining up near the residence."  It passes the house, quickly backs up, and stops in front of the house.  The truck's hazard lights turn on.  The driver gets out, approaches the house, and gets back in the truck.

There are several gunshots inside the house.  The assailants emerge, run straight to the truck, and jump in the back.  The truck takes off.

Chavez had been shot three times. He died from these wounds in a hallway.

Chavez, known as "Cloudy," was associated with the Los Nietos gang. He was living in the garage of the gang hub. When Chavez arrived home that evening, he warned the man out front in his car about a flatbed truck. He told a woman inside the house he was scared and was going to hide in the bathroom. He was trembling.

Two days after the shooting, police spotted a speeding Mercedes making multiple traffic violations. They attempted a traffic stop, but the car did not stop. The car ran a red light and stop signs, drove on the wrong side of the road, nearly hit one car, and stopped only after crashing into another car and seriously injuring a passenger. Police arrested driver Medrano and the female passenger. They found a gun in the car.

The passenger told detectives she tried to get Medrano to pull over, but he refused. He pulled out a gun, struck her in the head with it, and said he would shoot her if she tried to jump out of the car. Medrano threw the gun to her after the crash. At trial, this witness—who had been charged with possession of a firearm for this incident—backtracked from these statements and said she never saw a gun before the crash. She testified she knew Medrano as "Blanco" and had gotten to know him through an ex-boyfriend who, like Medrano, was a Dead End Locos gang member.

A ballistics expert analyzed the gun from the Mercedes and the bullets from Chavez's body and concluded this gun fired the fatal shots.

In jail, one of the assailants, Daniel Frias, made incriminating statements to two *Perkins* agents: informants

posing as inmates.  The conversation was recorded.  Frias mainly talked with one informant, who was older and seemed to have significant experience in custody.  They discussed gangs and other things, and Frias said he was "D-Boy from Whittier, Dead End."

Mid-conversation, an officer led Frias out of the cell.  Frias was shown photographs of the crime scene, the truck, and "all my homeboys that were like kind of involved[.]"  He came back to his cell confirming it was "a hot one"—a murder.  The detectives claimed to have evidence against Frias, but Frias told the main informant, "you can't see my face, dog."  He described how he had covered himself, worn all black and "double gloves" for the crime, and burned his clothes afterwards.

Frias also talked about Blanco, his "boy."  He told the informant "Blanco supposedly got caught with the strap" (the gun).  The informant and the detectives intimated Blanco had been "snitching."  Frias questioned why his boy would say he's "doing it" when he "didn't do it[.]"  Blanco "was the driver" "that's it, dog."  "Homeboy didn't even fucking do shit, dog."

Frias described the murder and what precipitated it:  gang members from Los Nietos had carjacked and "pistol-whipped" Frias in front of his "heina" at a Jack in the Box.  "[T]he next day, fool, we planned it out."  He clarified that "we" meant Blanco, Downer, and himself.  ("Downer" is the moniker for Medrano's co-defendant, Carlos Mendoza.)  Frias referred to Blanco and Downer as his "crimies"—the gang members who committed the crime with him.

Frias explained what happened.  Blanco "got a G-ride" (a stolen vehicle or a car gang members use to commit crimes), while Frias and Downer each had a "burner" (a gun).  Others

4

helped modify the license plate of the white pickup truck. Blanco drove Frias and Downer to the home of a young "fool" Frias believed to be one of the Los Nietos rivals who had robbed him. They pulled up to the house, and Frias and Downer "hopped out." Downer held two people hostage in front of the home. Frias saw the "fool" run into the house, ran in after him, and asked if he was from Los Nietos. When the "youngster" confirmed,"[p]ow, pow, pow, pow, right on his face, fool." "I went inside the house and popped that fool." Frias claimed he shot the victim at close range and emptied his firearm. "Sixteen shots, fool." Then he ran to the truck, where Blanco was waiting. Frias gave Blanco the gun and told him to get rid of it.

Frias said he felt no remorse. In fact, he felt better after the killing and only was remorseful that the victim—or someone else—pistol-whipped him and "made [him] look like a bitch." "Because I know at the end of the day, it's kill or be killed, dog, honestly, dog. So I'm a gang member, fool. This is what we do, dog." Frias got a teardrop tattoo on his face to signify he had killed someone.

The prosecution played a redacted version of the recording for the jury. This version omitted comments about Medrano's evasion incident, his supposed knowledge, and the strength of the evidence against him.

Other evidence tied Medrano to the shooting. Around the time of Chavez's murder, an acquaintance of Medrano's with ties to the Dead End Locos gave Medrano a can of gasoline at a Downey gas station. He knew Medrano as "Blanco." Medrano and some others were by a white flatbed truck that matched the truck from the surveillance video. It looked like Medrano was getting gasoline for the truck.

5

Several days after the shooting, a traffic officer found the white flatbed truck abandoned in East Los Angeles, very close to where the police pursuit with Medrano began. The truck had been reported stolen.

The jury learned more about Medrano and his gang from the prosecution's gang expert. Medrano, Frias, and Mendoza were members of Dead End Locos, a Whittier gang with 25 or 30 members, including 10 active members. Medrano had tattoos related to his gang on his head, back, hand, and stomach.

Los Nietos is a rival gang in neighboring territory. Members of these two gangs would not want to go into each other's territories unarmed.

The gang expert testified about the importance in gang culture of earning and maintaining respect. Gang members "put in work" or commit crimes for the gang to earn respect. Murdering a rival garnered the most respect. If a gang committed a crime against a rival gang, one would expect the latter would seek revenge to maintain respect. "Soft" gangs "can be taken advantage of . . . ."

The prosecution's trial theory was Frias killed Chavez as retaliation for the carjacking by Los Nietos. Frias planned this attack with fellow Dead End Locos members Medrano and Mendoza. They were all in it together.

Neither Medrano nor Mendoza presented witnesses.

The jury convicted Medrano and Mendoza of second degree murder. (§ 187, subd. (a).) The jury also convicted Medrano of fleeing a peace officer and causing serious bodily injury. (Veh. Code, § 2800.3, subd. (a).) The court sentenced Medrano to 20 months plus 15 years to life in prison.

A separate jury convicted Frias of first degree murder.

Only Medrano's appeal is before us, and he challenges only his murder conviction.

II

Medrano contends insufficient evidence supports his murder conviction and the trial court should have excluded Frias's jailhouse statements.  His contentions lack merit.

A

We apply the familiar substantial evidence standard of review to Medrano's first challenge.  We examine the record in the light favorable to the prosecution and discern whether substantial evidence allowed the jury to find the defendant guilty beyond a reasonable doubt.  We presume the existence of facts the jury reasonably could deduce from the evidence.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)  We accept logical inferences the jury might have drawn from the evidence and reverse only if it appears there is insufficient evidence to support the verdict under any hypothesis.  (*Ibid.*)

Substantial evidence supports this murder verdict.

The prosecution's theory was Medrano aided and abetted murder—an unlawful killing of a human with malice aforethought.  (See § 187, subd. (a).)  Defendants are liable where they:  (1) aid or encourage the commission of a murder, (2) knowing the perpetrator intended to commit this crime, and (3) intending to facilitate or encourage its commission.  (*People v. Curiel* (2023) 15 Cal.5th 433, 466, 468; CALCRIM 401.)  The aider and abettor must have formed the intent to facilitate the crime before or during the crime.  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1121 (*Ramirez*).)

Medrano argues evidence of the requisite mens rea is missing. His *reply* brief claims the actus reus component also was missing.

Evidence supported each element.

Frias's statements created a reasonable inference that he, Medrano, and Mendoza collectively planned the murderous attack on Chavez to avenge the earlier carjacking. Frias said the three of them "planned it out" the day after the carjacking. They executed the plan later that day. The attack itself showed planning: the driver surveyed the property, the assailants took care to conceal themselves and leave no casings at the scene, they attacked efficiently, and the driver acted in concert with the gunmen. This evidence shows Medrano knew of Frias's intent before the shooting, shared this intent, and sought to assist him.

The prosecution established a motive bolstering the jury's finding Medrano had the requisite intent. According to the gang expert, respect plays a role in gang culture, the desire for respect drove a need to retaliate against a rival who wronged one's gang, and murder earned the most respect. Medrano, Frias, and Mendoza were members of the Dead End Locos gang, which feuded with Los Nietos. A jury reasonably could infer the threesome intended to kill Chavez to retaliate against Los Nietos and to restore respect to their gang after a humiliating carjacking by their rival.

Retribution explains why this threesome went to the house to kill Chavez, not simply to rob unknown people there. If murder were not the plan but instead was the result of Frias going "rogue" and seeking "personal revenge," as Medrano argues, why would Medrano accept the gun afterwards? Why

would Frias not let on that he had gone rogue when divulging so many details about the crime in jail?

The evidence also shows guilty acts by Medrano. Medrano assisted in the murder by obtaining a stolen work truck and by serving as the driver. He took two armed gang members to ambush a rival hub. He facilitated both the attack and the getaway. Then he took the murder weapon and evaded police to avoid getting caught.

Medrano repeatedly argues for different inferences from the evidence, which contradicts our standard of review. (See *Zamudio*, *supra*, 43 Cal.4th at p. 357; see also *id.* at p. 358 ["Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal"].)

Medrano suggests we must reject any inference that he planned this murder and that he had the requisite mens rea because the jury acquitted him of first degree murder. "[T]here is no requirement of consistency among verdicts on separate charges so long as substantial evidence supports the offenses convicted upon." (*Ramirez*, *supra*, 13 Cal.5th at pp. 1121–1122.)

Citing section 1111, Medrano maintains we must ignore Frias's jailhouse statements because independent evidence did not corroborate them. This claim is incorrect on multiple fronts.

Section 1111 concerns accomplice testimony. It requires corroborating evidence when an accomplice *testifies* or makes out-of-court statements under suspect circumstances that undermine their reliability, such as during police questioning. (*People v. Hoyt* (2020) 8 Cal.5th 892, 946–947.) Although Frias showed no sign that he suspected his cellmates were informants, for

9

argument we will assume he confessed under suspect circumstances. (Cf. *People v. Jeffery* (1995) 37 Cal.App.4th 209, 218 [accomplice's statements to undercover officer during drug sale, without knowledge of the officer's true identity, were neither suspect, untrustworthy, nor unreliable and thus required no corroboration].)

Nevertheless, as we explain further in the next section, Frias's statements properly came into evidence as declarations against his penal interest, and no corroboration is required for these statements. (See *People v. Brown* (2003) 31 Cal. 4th 518, 555–556 (*Brown*); see also *People v. Gallardo* (2017) 18 Cal.App.5th 51, 81 (*Gallardo*) ["The trial court was correct . . . that section 1111's corroboration requirement is inapplicable to an out-of-court statement that is admissible as a declaration against interest"].)

Even if we assume section 1111 applied to Frias's out-of-court statements, there was no error. Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration standing alone. It need not establish every element of the charged offense or corroborate every fact to which the accomplice testifies. (*Brown*, *supra*, 31 Cal.4th at p. 556; *People v. Jones* (2018) 26 Cal.App.5th 420, 439 (*Jones*).) It suffices here if it tends to connect Medrano with Chavez's murder such that it could satisfy the jury that Frias was telling the truth. (See *Brown*, *supra*, 31 Cal.4th at p. 556.)

Medrano's flight from police with the murder weapon showed consciousness of guilt and corroborated Frias's statements. (See *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1378 [flight suggests consciousness of guilt, tends to connect an accused with a crime, and may signal an accomplice's testimony

is truthful]; *Jones*, *supra*, 26 Cal.App.5th at pp. 440, 441 [noting "[e]vidence of a defendant's consciousness of guilt . . . is admissible to prove the crime" and "defendant's own conduct or statements may provide adequate corroboration for accomplice testimony"].) Medrano went to lengths to avoid getting caught with the gun by threatening his passenger and putting innocent lives at risk.

The sighting of Medrano, around the time of the murder, by what we infer was the stolen truck provides further corroboration that the truck was his responsibility under the threesome's plan.

Crediting the evidence favoring the verdict and drawing reasonable inferences to support the judgment, Medrano's substantial evidence challenge fails.

B

Medrano next claims the trial court erred and infringed his constitutional rights by admitting Frias's recorded statements over defense objections.

The challenged statements appear to fall into four buckets: (1) Frias implicated Medrano as the driver; (2) Frias "planned it out" with Medrano and Mendoza; (3) Medrano "got a G-ride" for the job; and (4) Frias gave Medrano the gun and told him to dispose of it.

Admitting these statements was not an abuse of discretion. (See *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400 (*Arauz*) [abuse of discretion standard governs]; see also *id.* at p. 1397 ["Where, as here, an accomplice inculpates himself and his codefendant to a fellow inmate/informant, his statements, if trustworthy, are admissible in the codefendant's trial. Such statements are declarations against penal interest, are not

11

'testimonial,' and their admission does not violate the confrontation clause"].)

For a hearsay statement to be admissible as a declaration against penal interest, the declarant must be unavailable, the declaration must have been against the declarant's penal interest when made, and it must be sufficiently trustworthy. (Evid. Code, § 1230; *People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) In making this determination, courts may consider the declarant's words, the circumstances under which they were uttered, the declarant's possible motivation, and the declarant's relationship to the defendant. (*Ibid*.)

The challenged statements meet each prong of the hearsay exception.

First, Medrano concedes Frias was unavailable because he invoked his Fifth Amendment privilege not to testify.

Second, the statements implicating Medrano disserved Frias's interests. They were inextricably tied to and part of a specific statement against Frias's penal interest. (*Grimes*, *supra*, 1 Cal.5th at p. 715; see also *Arauz*, *supra*, 210 Cal.App.4th at pp. 1397, 1400–1401.) Frias admitted personally shooting and killing the victim. He also admitted planning ahead with Medrano and Mendoza. Describing Medrano's role was not a collateral matter. It helped elucidate Frias's pivotal role and the entire scheme. It also showed Frias had the mental state for first degree murder (of which he was convicted) and exposed him to gang liability. (See *Grimes*, *supra*, 1 Cal.5th at p. 716 ["the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant"].)

12

Third, looking at the totality of the circumstances, we conclude the challenged statements were trustworthy. The long exchange between Frias and the main informant shows Frias was confiding to an older and seemingly more experienced inmate and gang member who was willing to listen and to provide advice. There is no sign Frias suspected he was speaking to an informant. Frias repeatedly maintained he was the shooter, and he killed in cold blood, while his "crimies" played lesser roles. Frias was taking primary responsibility for the murder, not minimizing his role or shifting blame. (See *Grimes*, *supra*, 1 Cal.5th at p. 716 [a statement "is more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility"]; *People v. Duarte* (2000) 24 Cal.4th 603, 612 [trustworthiness test not met where a declarant admits some complicity but places the major responsibility on others].) Frias clearly was not looking to improve his situation with the police through these statements. He was not seeking to elevate his status within his gang, as the informant did not claim to be a member. And he was not trying to protect Medrano, as Frias appeared to believe Medrano was "snitching."

Medrano argues Frias's statements were untrustworthy because the detectives and the informants relied on a ruse to get Frias talking and implicating others. This ruse does not render Frias's statements inadmissible, as a reasonable person in Frias's position would not have made the statements Frias made to a person of no apparent consequence to him unless he believed them to be true. (See *Arauz*, *supra*, 210 Cal.App.4th at p. 1399, fn. 3 ["the police are permitted to use a subterfuge to obtain an

13

inculpatory statement as long as the subterfuge is not likely 'to produce an untrue statement' "].)

It is true Frias at one point told the informant "Homeboy didn't even fucking do shit[.]" Frias also appeared to exaggerate his own ruthlessness at times. For example, he apparently did not "let out the whole clip" on the victim's face, as he claimed. Given the many details Frias reported that matched the facts of this murder, his occasional embellishments and one seeming understatement that makes sense in context do not render the challenged statements untrustworthy. Showing Frias may have "puffed" regarding his own acts does not show the trial court abused its discretion in admitting the challenged statements. (See *People v. Dalton* (2019) 7 Cal.5th 166, 207–208 (*Dalton*).)

Medrano claims a key statement ("the next day, fool, we planned it out") is vague, and Frias could have been admitting to a planned robbery or assault and not a planned murder. Highlighting an ambiguous statement does not show the trial court abused its discretion in admitting it under the declaration-against-interest hearsay exception. (See *People v. Cortez* (2016) 63 Cal.4th 101, 125.)

Medrano also fails to establish the court violated Evidence Code section 352 by letting the jury assess this statement and discern Frias's meaning, which was apparent: immediately after making the statement, Frias proceeded to describe how the threesome secured a "G-ride" and guns and went to the home of the "fool" from Los Nietos, and how Frias pursued him inside and shot him dead while Downer held others hostage and Blanco waited in the car.

Medrano argues admitting Frias's statements violated various constitutional rights. He appears to recognize there was

14

no confrontation clause violation, as Frias's statements were nontestimonial.  (See *Dalton*, *supra*, 7 Cal.5th at pp. 208–209; *Gallardo*, *supra*, 18 Cal.App.5th at pp. 65–68.)

The same reasoning that led us to conclude Frias's statements were trustworthy leads us to conclude the statements were not so unreliable that their admission violated Medrano's rights to due process and a fair trial.  (See *Dalton*, *supra*, 7 Cal.5th at p. 208, 209 [no separate constitutional discussion required where rejection of a claim on the merits necessarily leads to rejection of the constitutional theory].)  This trial was not fundamentally unfair.

## DISPOSITION

We affirm the judgment.


                                                    WILEY, J.

We concur:



STRATTON, P. J.



VIRAMONTES, J.

15